716 P.2d 1152

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Michael Shawn SCROGGINS,
Defendant-Appellant.**

**No. 15457.**

Supreme Court of Idaho.

Dec. 19, 1985.

On Denial of Petition for Rehearing
April 29, 1986.

Kenneth F. White, and Van G. Bishop, Nampa, for defendant-appellant.

Jim Jones, Atty. Gen. and Lynn E. Thomas, Deputy Atty. Gen., Boise, for the plaintiff-respondent.

HUNTLEY, Justice.

Michael Shawn Scroggins appeals from a conviction of first-degree murder and attempted rape of thirteen-year-old Mondi Lenten. Scroggins was sentenced to death for first degree murder and received a fixed sentence of ten years for the attempted rape to run concurrent with the death sentence. Scroggins' co-defendant, Albert Beam, was convicted of first-degree murder and rape and was sentenced to death for the murder and to a fixed 30 year term for the rape. In *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985), this Court affirmed Beam's conviction and sentence.

Scroggins appeals his conviction arguing that the district court erred in using two separate juries, one for Scroggins and one for Beam, in a simultaneous trial. He also claims that the trial court improperly admitted into evidence certain state exhibits, erroneously refused to grant a new trial based upon new evidence and failed to properly instruct the jury.

Scroggins also appeals his death sentence challenging the constitutionality of Idaho's death sentencing procedure and contending that the trial court's findings in support of the death penalty were erroneous. He further maintains that the trial court imposed the death penalty in an arbitrary and capricious manner and that the sentence imposed was excessive and disproportionate.

## I. STATEMENT OF THE FACTS

Michael Scroggins stood charged by Information of the following crimes:

### COUNT III

That MICHAEL SHAWN SCROGGINS on or about the 8th day of July, 1983 in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, unlawfully, feloniously and with malice aforethought and premeditation, kill a human being, to wit: Mondi Jeanine Lenten, by then and there causing the said Mondi Jeanine Lenten to be drowned, thereby mortally wounding said Mondi Jeanine Lenten, from which wounds said Mondi Jeanine Lenten died on or about the 8th day of July, 1983, in the County of Canyon and State of Idaho.

All of which is contrary to Idaho Code Sections 18–4001, 18–4003(a), and 18–4004 and against the power, peace and dignity of the State of Idaho.

### COUNT IV

That MICHAEL SHAWN SCROGGINS on or about the 8th day of July, 1983 in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, unlawfully, feloniously, forcibly and against the consent of Mondi Jeanine Lenten, not the wife of said defendant accomplish an act of sexual intercourse with said female and she was prevented from resistance by threats of immediate and great bodily harm, accompanied by

an apparent power of execution on the part of the said defendant.

The Information also alleged that Scroggins, "did wilfully, knowingly, intentionally, unlawfully and feloniously commit those acts charged" in Counts III and IV "of the Information on file herein through the carrying, displaying, using, threatening or attempting to use a firearm or other deadly weapon, to wit: a knife."

Scroggins' co-defendant Beam took the stand as a state witness and testified that Scroggins had raped the victim and that after Scroggins had raped the victim, he, Beam, had raped her. Beam also testified that Scroggins took the victim to a creek and there began pushing her head under water. According to Beam, Scroggins then slit the victim's throat. Beam claimed that because he, Beam, could not stand the sight of blood, he alone pushed her head under water until she was drowned.

Scroggins also testified at his own trial. He acknowledged that he had accompanied Beam and the victim to the creek and that at one point, he had handcuffed her. He conceded that the knife used to cut her throat belonged to him but said that *he* did not cut her. He admitted that he was present in the vicinity when Beam raped the victim, but said that he did not observe the act. He testified that he, Scroggins, had begun to mount the victim but had not proceeded to have intercourse with her. The morning after the crimes were committed Scroggins went to the police station and reported them. Although the officers did not at first believe Scroggins' story, he convinced them to believe him and took them to the scene of the crime.

As the judge noted at the time of sentencing, the Scroggins' jury, by its verdict, did not believe Beam's testimony. Scroggins' jury found that Scroggins did not use a knife, that he did not commit rape but was guilty of attempted rape, and that he did not directly commit the crime of murder but rather aided and abetted the commission of a felony-murder, a killing committed during the perpetration of an inherent-

ly dangerous felony, which in this case, was attempted rape.

## II. DID THE TRIAL COURT DEPRIVE SCROGGINS OF DUE PROCESS BY JOINTLY TRYING HIM WITH HIS CO-DEFENDANT AND BY USING SEPARATE JURIES SITTING IN THE SAME COURTROOM?

■ Beam testified before his own jury and also testified before Scroggins' jury. Scroggins testified before his own jury only and did not testify before Beam's jury. Scroggins argues that the joint trial procedure employed here effectively denied him due process of law particularly in light of the testimony of one Sandra Wahlen. Wahlen, Beam's fiance, took the stand and began to testify as to statements made to her by Beam. Scroggins' attorney requested that Scroggins' jury be excused from the courtroom during Wahlen's testimony because the prosecutor's questions might elicit answers which would violate the *Bruton* rule. Beam's counsel similarly objected. The objection was sustained as to Scroggins but was overruled as to Beam. The trial court then removed the Scroggins' jury and the State pursued direct examination of Wahlen before the Beam jury only. Wahlen testified that on the evening of the murder, Beam told her, "*I* think *I* killed somebody." (Emphasis added). Scroggins' attorney considered that testimony to be inculpatory as to Beam but *exculpatory as to Scroggins*. Therefore, Scroggins' attorney requested that *that* portion of Wahlen's testimony be read back to the Scroggins' jury. The trial court did not grant that request but instead permitted the state to again call Wahlen to the stand and testify before the Scroggin's jury. When she resumed testimony, Wahlen stated that Beam had told her, "I think *we* killed somebody." This testimony was, of course, inculpatory as to both Beam *and* Scroggins. Scroggins insists that Wahlen's testimony violated the rule announced in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton*, in a joint trial of the petitioner and his accomplice, the prosecutor introduced the accom-

plice's confession into evidence through the testimony of a postal inspector. The accomplice, however, did not testify. The confession explicitly incriminated the petitioner. He objected, claiming a denial of confrontation. The district court cautioned the jury that the confession was admissible only against the accomplice. The Court of Appeals affirmed. On certiorari, the Supreme Court reversed. It found a denial of the right of confrontation notwithstanding the trial court's cautionary jury instruction. In the present case, since the accomplice, Albert Beam, in fact testified at Scroggins' trial, the *Bruton* situation was not present. In *Bruton*, the petitioner was unable to confront his accomplice because the accomplice did not testify. In the present case, Beam testified before Scroggins' jury and Scroggins had the opportunity to cross-examine him as to any statements presented through the testimony of other witnesses, such as Ms. Wahlen. Had Beam not testified in Scroggins' trial, our determination would be different, the result being that Ms. Wahlen's testimony would not have been admissible in Scroggins' trial. However, since Beam testified at Scroggins' trial, Scroggins was not denied the right of confrontation.

■ While we conclude that the use of the dual jury system in the present case does not pose grounds for reversal, the potential for serious error in a complicated case may caution against its use.

## III. DID THE TRIAL COURT ERR IN ADMITTING INTO EVIDENCE PHOTOGRAPHS OF THE DECEASED'S BODY?

■ As part of the state's case-in-chief, Dr. Thomas Donndelinger, a pathologist, was called to testify as to the cause of death, alleged in the Information to be drowning. During the course of the examination, the state presented several photographs of the decedent's body, which photographs depicted bruises and abrasions. The prosecutor asked Dr. Donndelinger whether the photographs would assist him in describing his observations and in articulating medical conclusions. When the state moved to admit the photographs, Scroggins' counsel objected, claiming that the photographs were highly prejudicial and designed to inflame the jury. With regard to the photographs, Dr. Donndelinger's testimony established the following: (1) Exhibit 64 depicted a photograph of the wound beneath the victim's chin; (2) Exhibit 65 was a close-up of the left side of the wound; (3) Exhibit 66 was a close-up of the wound under the upper part of the neck; (4) Exhibit 67 was another close-up of the right side of the wound. The prosecutor's questions for Dr. Donndelinger were not based on his observations of the photographs but of his observations of the actual throat wound. Scroggins contends therefore that the photographs were not introduced to assist Dr. Donndelinger in describing the wounds but rather to inflame the jury's passion.

Where allegedly inflammatory evidence is relevant and material as to an issue of fact, the trial court must determine whether the possible prejudice that might inure to the defendant by admission of the evidence is outweighed by its probative value. *State v. Wilson*, 93 Idaho 194, 196–97, 457 P.2d 433, 435–36 (1969). The determination of whether or not to admit evidence challenged on the ground that it is more prejudicial than probative is within the trial court's discretion. *State v. Abel*, 104 Idaho 865, 870, 664 P.2d 772, 777 (1983). The facts of the present case present a close question as to whether the trial court abused its discretion in admitting the evidence. Clearly, the photographs were somewhat prejudicial; and, in retrospect it is apparent that the photographs were not, in fact, used by the prosecution for the purpose for which they were ostensibly admitted. Nonetheless, we cannot conclude that the trial court abused its discretion in admitting the photographs.

By Information, the state sought to enhance the murder charge by an allegation that a knife had been used in its commission. Even though the cause of death in the murder charge itself was drowning, it

is clear that the victim had had her throat slit and that the throat slitting had either preceded the drowning or had happened at the same time. Hence, evidence establishing that the victim had her throat slit was relevant to the murder charge and the accompanying allegation that the defendant had used a knife. Although we are somewhat troubled by the fact that the prosecutor's purported reason for admitting the photographs was to assist Dr. Donndelinger with his testimony, and in retrospect, it appears that the photographs may not have been used for that purpose, they were nonetheless relevant evidence and their admission is not cause for reversal.

## IV. DID THE TRIAL COURT ERR BY DENYING SCROGGINS' MOTION FOR A NEW TRIAL BASED UPON SCROGGINS' REPRESENTATION THAT BEAM HAD NOT TOLD THE WHOLE TRUTH AT TRIAL?

■ After trial, while Scroggins was incarcerated on death row, Beam delivered a note to Scroggins. In the note, which Scroggins' counsel attached to the motion for a new trial, Beam stated, "Please forgive me Shawn I was worry [sic] by not telling the truth and about you as well." Scroggins filed for a new trial based upon his contention that the note was evidence that Beam's testimony had been perjured. The motion was denied without prejudice.

I.C. § 19–2406 provides in relevant part: Grounds for new trial.—When a verdict has been rendered against the defendant the court may, upon his application, grant a new trial in the following cases only:

. . . .

7. When new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly-discovered evidence, the defendant must produce at the hearing in support thereof the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable.

I.C.R. 34 provides:
The court on motion of a defendant may grant a new trial to him if required in the interest of justice. . . .

The question of whether the interest of justice requires a new trial under the circumstances of a particular case is directed to the sound discretion of the trial court; and the trial court's decision thereon will not be disturbed absent an abuse of that discretion. *State v. Olin*, 103 Idaho 391, 399, 648 P.2d 203, 211 (1982). Hence, our inquiry here must be whether the trial court should have granted a new trial in the interest of justice based upon the note from Beam to Scroggins. Scroggins contends that three inferences must be drawn from Beam's statement: (1) that Beam did not tell the truth in court; (2) that Beam did not tell the entire truth about *his own* participation; and (3) that he lied about *Scroggins'* participation. The state, on the other hand, claims that those inferences should not be drawn because the note does not state that Beam lied at trial, rather, it merely relates that he did more that night than he said he did. The state contends that the only proper inference is that Beam meant that he, Beam, was more culpable than he had previously admitted, but that Scroggins was no less culpable.

The circumstances giving rise to the motion for a new trial are troubling. In fact, the note is ambiguous and, indeed, both the inferences urged by the defendant and the inference urged by the prosecution could be drawn from it.

■ In *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928), the court held that where a party contends that a government witness falsely testified at trial, the following elements must be met: (1) that "[t]he court is reasonably well satisfied that the testimony given by the material witness is false;" (2) "[t]hat without it the jury might

have reached a different conclusion;" (3) "[t]hat the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *Larrison*, 24 F.2d at 87–88 (emphasis omitted). Although the circumstances of the instant case do not fall neatly within the purview of I.C. § 19–2406(7) above, under the holding of *Larrison*, it would seem that in appropriate circumstances, where a defendant submits an affidavit by a government witness in which the witness recants his testimony and specifies in what ways he dishonestly testified and in what ways he would, if given the opportunity to testify again, change that testimony and where a defendant makes a showing that such changed testimony may be material to a finding of his guilt or innocence, a new trial should be held. In this case the note is subject to multiple inferences and does not constitute an affidavit. At this point, the record is simply not sufficiently developed to permit this Court to conclude that the trial court abused its discretion in denying the motion.

## V. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY FAILING TO INSTRUCT THE JURY REGARDING ACCOMPLICE TESTIMONY?

After trial, Scroggins moved for acquittal or, in the alternative, for a new trial on the grounds that the trial court committed reversible error by failing to instruct the jury with regard to accomplice testimony. The court denied the motion.

Scroggins contends that the only testimony implicating him in the homicide came from his co-defendant, Albert Beam.

I.C. § 19–2117 provides:

A conviction cannot be had on the testimony of an accomplice, unless he is *corroborated by other evidence*, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.

(Emphasis added.)

Scroggins contends that Beam's testimony was not corroborated by other evidence as required by I.C. § 19–2117. In response, the state contends that sufficient circumstantial evidence was introduced at trial so as to corroborate Beam's testimony. Moreover, the state contends that Scroggins' counsel's failure to object to the court's failure to give an accomplice instruction waived any right Scroggins had to such an instruction. The state acknowledges that fundamental error may be raised for the first time on appeal but suggests that matters relating to the credibility of witnesses do not raise questions of fundamental error and that accomplice corroboration instructions are concerned only with witness credibility.

In *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981) this Court held:

Death is clearly a different kind of punishment from any other that may be imposed, and I.C. § 19–2827 mandates that we examine not only the sentence but the procedure followed in imposing that sentence regardless of whether an appeal is even taken. This indicates to us that we may not ignore unchallenged errors. Moreover, the gravity of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider errors not objected to below. Other jurisdictions similarly do not allow technical appellate rules to preclude a comprehensive review of those cases where a sentence of death has been imposed.

*Id.* at 410–11, 631 P.2d 192–93 (citations omitted).

We disagree with the state's assertion that this Court should not address the issue of the court's failure to instruct the jury as to accomplice testimony. Assuming, without deciding, that such an instruction should have been requested by counsel and, in the absence of such a request, the trial court should have so advised the jury, we deem

any failure in this regard to be harmless. Scroggins' own testimony at trial was sufficient to corroborate portions of Beam's testimony. At trial, Scroggins admitted that he assisted Beam in taking the victim to the creek, that he, Scroggins, had handcuffed the victim, that Beam had used Scroggins' knife, that he, Scroggins, had attempted to rape the victim and that he had been in the vicinity when Beam had, in fact, raped and murdered the victim.

Mere presence at the place of a crime or acquiescence in its commission, without participation, does not constitute a crime. *State v. Bradford*, 683 P.2d 924, 929 (Mont. 1984); *State v. Hystad*, 36 Wash.App. 42, 671 P.2d 793, 798 (1983); *Morrison v. State*, 518 P.2d 1279, 1281 (Okl.Cr.1974). Some aiding, abetting or actual encouragement on the part of the person charged is essential to make that person an accomplice. *State v. Brooks*, 103 Idaho 892, 904, 655 P.2d 99, 111 (Ct.App.1982). "To be an aider and abettor one must share the criminal intent of the principal; there must be a community of purpose in the unlawful undertaking." *State v. Duran*, 86 N.M. 594, 526 P.2d 188, 189 (1974) *cert. denied*, 86 N.M. 593, 526 P.2d 187 (1974); *State v. Boast*, 87 Wash.2d 447, 553 P.2d 1322, 1327 (1976). In a prosecution for felony-murder, the state is relieved of the burden of proving that a defendant had the specific intent to kill and instead need only prove that all individuals charged as principals had the specific intent to commit the predicate felony. Scroggins was convicted of aiding and abetting a felony murder, wherein the underlying felony was rape or attempted rape. Scroggins admitted to facts permitting the jury to conclude that he had attempted to rape the victim. "[A]n accomplice, having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the preplanned illegality." *State v. Davis*, 101 Wash.2d 654, 682 P.2d 883, 886 (1984). Hence, although Scroggins' testimony did not corroborate Beam's *version* of the

facts, it was sufficient to permit a finding that Scroggins was connected with the commission of the offense. Therefore, the district court's failure to give the accomplice instruction, even if it were erroneous, was harmless and hence does not give cause for reversal.

## VI. IS IDAHO'S CAPITAL SENTENCING PROCESS UNCONSTITUTIONAL BECAUSE OF ITS FAILURE TO REQUIRE THAT A JURY, AND NOT THE JUDGE, IMPOSE A SENTENCE OF DEATH?

In *State v. Sivak*, 105 Idaho 900, 906 674 P.2d 396, 402 (1983) and *State v. Creech*, 105 Idaho 362, 373–74, 670 P.2d 463, 474–75 (1983), this Court considered this issue and concluded that Idaho's capital sentencing scheme does not violate the Idaho and Federal Constitutions. We continue to adhere to that precedent.[1]

## VII. WAS THE DEATH SENTENCE PROPERLY IMPOSED?

■ Pursuant to the provisions of I.C. § 19–2827 we are required to review the trial court's decision to impose the death sentence in this case. I.C. § 19–2827(a), (b) and (c) provide:

(a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, *the sentence shall be reviewed on the record by the Supreme Court of Idaho.*

(b) The Supreme Court of Idaho shall consider the punishment as well as any errors enumerated by way of appeal.

(c) With regard to the sentence the court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judges finding of a statutory aggravating circumstance from among those enu-

---

1. The author of this opinion continues to adhere to the views expressed in his *Sivak* and *Creech* dissents.

merated in section 19–2515, Idaho Code,. and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Our review of a death sentence is qualitatively different than our review of an ordinary criminal sentence which is subject to review in this Court on an abuse of discretion standard. *E.g., State v. McPhie,* 104 Idaho 652, 662 P.2d 233 (1983); *State v. Wilson,* 100 Idaho 725, 604 P.2d 739 (1970); I.C. §§ 19–2515, 19–2827. However, with a death sentence I.C. § 19–2827(a) requires this Court to make an independent review of the sentence on the record, and the abuse of discretion standard which otherwise applies in criminal sentencing reviews is not applicable.

For reasons set forth below, we conclude that the sentence of death is excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have painstakingly considered the record, and in so doing, have focused not only on the crime and the circumstances surrounding its commission but on the age, characteristics, criminal record and personal involvement of *this* defendant. We must conclude that the death sentence should not have been imposed in this case because in light of the following considerations, the death sentence as applied to this defendant was excessive.

In the seminal death penalty case of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court recognized that the death penalty is unique in its severity and irrevocability, and required that the State must focus on the *defendant's personal intent, character and culpability and not merely that of an accomplice, before the death penalty may be constitutionally imposed. Id.* at 798, 102 S.Ct. at 3377. Hence, while all principals in the commission of a crime may be *charged* identically, regardless of who committed which act, for

purposes of *sentencing,* the court must focus on the *particular* acts of the *indi-vidual* defendant.

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) the United States Supreme Court underscored the fact that the death penalty is qualitatively different from that of any other sentence. The Court emphasized that a reviewing court must carefully consider the circumstances of the particular offense and the record of the individual offender. Clearly, Scroggins was morally culpable and should be severly punished. However, keeping in mind the jury verdicts in Scroggins' case and Beam's case, we are reminded that the Scroggins' jury's verdict reflected that Scroggins' level of participation in the crime did not rise to the same level as Beam's. According to the jury verdicts, Beam alone did the actual killing. According to the jury verdict, Scroggins did not personally commit the crime of murder but aided and abetted the commission of a felony murder. Scroggins' jury returned its verdict form leaving the section charging Scroggins with premeditated and deliberate murder unsigned. Beam raped the victim while Scroggins went only so far as to *attempt* rape but did not complete the act. According to the jury verdict, Scroggins did *not* cut the victim's throat. We also note that Scroggins not only reported the crime to the police but insisted upon taking them to the crime scene even when they disbelieved his story. In *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985) we acknowledged that where co-defendants are each charged with and convicted of first degree murder and where they receive disparate sentences, such disparity may be justified where one defendant did the actual killing while the other did not, and where, because of their respective levels of criminal involvement, one defendant may be deemed more culpable than the other. It would seem that in this instance, the trial court's focus was on the crime and not on the personal culpability of this particular defendant as that culpability is reflected by the jury verdict and the evidence

adduced at trial upon which the verdict was clearly based.

As the presentence report indicates, Scroggins does not have a history of violent criminal conduct. While it is true that he has been under the supervision of the Department of Health and Welfare for a number of years, that supervision was necessary because of his particularly unstable, unnurtured, and inadequate upbringing. Scroggins was eighteen at the time of the crime. His mental age was 13.8 years. Because of his chaotic and troubled childhood, Scroggins was and is under tremendous psychological pressure and has failed to develop mature responses to stressful situations.

In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) the United States Supreme Court reversed a judgment imposing a death sentence on sixteen-year-old Monty Lee Eddings. In reaching that result the Court instructed:

The trial judge recognized that youth must be considered a relevant mitigating factor. But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults. *Bellotti v. Baird*, 443 U.S. 622, 635 [99 S.Ct. 3035, 3044, 61 L.Ed.2d 797] (1979).

Even the normal 16-year-old customarily lacks the maturity of an adult. In this case, Eddings was not a normal 16-year-old; he had been deprived of the care, concern and paternal attention that children deserve. On the contrary, it is not disputed that he was a juvenile with serious emotional problems, and had been raised in a neglectful, sometimes even violent, family background. In addition, there was testimony that Eddings' men-

tal and emotional development were at a level several years below his chronological age. All of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing.

We are not unaware of the extent to which minors engage increasingly in violent crime. Nor do we suggest an absence of legal responsibility where crime is committed by a minor. We are concerned here only with the manner of the imposition of the ultimate penalty: the death sentence imposed for the crime of murder upon an emotionally disturbed youth with a disturbed child's immaturity.

*Eddings*, 455 U.S. at 115–16, 102 S.Ct. at 877–78.

Although unlike Eddings, Scroggins was not a minor at the time of the criminal act, at eighteen years of age he had barely reached the age of majority. We cannot ignore the Court's admonition that "youth is more than a chronological fact." Just as Eddings was not a normal sixteen-year-old, Scroggins was not a normal eighteen-year-old. Like Eddings, Scroggins had been deprived of the "care, concern and paternal attention that children deserve." Also like Eddings, Scroggins' mental and emotional development were at a level well below his chronological age. There is little question that Scroggins is deserving of moral blame and lengthy incarceration, but in our view he should not be put to death.

In sentencing Scroggins, the judge remarked:

I have agonized over this for a long time because of the jury's finding, because of the fact that maybe you did not directly commit that crime. But, I have resolved in my mind maybe why you did not directly commit that crime, that your criminal culpability was every bit as great but

nevertheless, because you are eighteen years of age and you do not have a prior criminal record, there may be sound legal argument for a fixed life sentence, but going over that and giving long consideration to it, in my judgment I believe that a fixed sentence is wrong, even though the jury has decided this matter in the manner in which they have.

The reason I feel it is wrong is because the record is clear as we have talked about it. Extensive efforts have been made to treat and rehabilitate you and there has been no measurable success. The psychological evaluation that was requested by both counsel and yourself has described you as being unpredictable and dangerous to others. The home environment in which you have been raised and with the history that exists here, in my judgment if you were placed in a penitentiary setting, your condition could only worsen. Your self-image would deteriorate. The overall test profile according to the medical authorities, "It is indicative of a prepsychotic personality with a predisposition towards paranoid schizophrenia." Again, it would be a violation of this court's conscience to believe that effective treatment is available to you in the penitentiary setting, that if you were given a fixed life sentence, even if it were available, that the necessary funds would be expended by the state to remedy that situation by placing you in a different environment and with the constant medical treatment and counseling that would be necessary.

The nature of the crime, your age, your intelligence level being in the dull-normal range, your physical, mental appearance, your ingrained sexual fantasies, your abnormal behavior would assure, in my judgment, your being victimized in the penitentiary by other inmates unless you were kept confined and away from other inmates, in and of itself a source of cruel and unusual punishment because of the constant confinement.

To put a person in the penitentiary that realistically is incapable of being rehabilitated on any subjective criteria that we have, would likewise victimize, in my judgment, society as well as the victim in this case inasmuch as the cost[s] of warehousing a person [and] institutionalizing them are prohibitive when there is no light at the end of the tunnel.

■ The court thereby expressed concern that Scroggins, if imprisoned, would not receive the type of medical and psychiatric care he would need in order to be rehabilitated because the state would not appropriate sufficient funds. Assuming for purposes of this discussion that the state refuses to properly fund its rehabilitative program, that would not be a reason to choose death over life. There is simply no authority for the proposition that a state's failure to expend adequate funds for inmate services is a factor to be considered in imposing the death penalty.

Our holding today reflects our concern that the death penalty only be imposed in cases where its imposition is unmistakably warranted. This is not such a case. We therefore affirm the conviction, vacate the sentence and remand for re-sentencing.

DONALDSON, C.J., and BAKES, J., concur.

SHEPARD, Justice, concurs in part and dissents in part.

I concur in the opinion of the Court except as to Part VII—was the death sentence properly imposed—and as to Part VII I dissent.

The majority opinion concludes "that the sentence of death is excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." However, the majority, in my view, is in effect overturning the trial judge's decision as to aggravating and mitigating circumstances.

The majority focuses upon Scroggins' level of participation in the crime. The majority ignores the testimony of Bean who testified clearly that the killing was committed by Scroggins. Scroggins' testimony as to the commission of the crime is

equivocal, evasive, and contradictory to prior statements made by him. The trial court had before it evidence indicating that Scroggins was the instigator and the driving force behind the commission of the crime.

The majority focuses also upon the "chaotic and troubled childhood" of Scroggins and indicates that he is under "tremendous psychological pressure and has failed to develop mature responses to stressful situations." The troubled childhood of Scroggins is exemplified by almost continual psychological problems and attempts at counseling, none of which were resolved, and have resulted in a series of commitments to juvenile facilities in several states. He has had more or less continual conflicts with the law in criminal activity, albeit as a juvenile, some of which contacts were as a result of felonious activities. The trial court had further evidence before it that indicated that Scroggins showed little emotion or remorse for the crimes; that Scroggins is unpredictable and dangerous to others and will constitute a continuing danger to society; that Scroggins will, in the future, undoubtedly give in to unrestrained sexual gratification and or aggression; that sexual deviation was a large factor in the instant crime; and that he will never become a functional member of society. It was further indicated that Scroggins has a prepsychotic personality with a predisposition towards paranoid schozophrenia, and is unpredictable and dangerous to others.

Although there is no showing that Scroggins' mental status in any way constitutes any legal or practical excuse or defense for the crime, it nevertheless, in my view, indicates that he is and will continue to be a non-functional member of society, and is and will continue to be extremely dangerous, with the potential for further crimes of violence even if incarcerated for the rest of his life.

Even though the majority opinion purports to reverse the importance of the death penalty on the basis of proportionality, it fails to discuss any similar cases decided by the Court in the recent past

such as *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983); *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983); and *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985), all of which are not substantially dissimilar to the instant case, and in all of which the imposition of the death penalty was upheld.

BISTLINE, Justice, concurring in part, concurring specially, and dissenting in part, in which HUNTLEY, Justice, concurs as to Part III.

I.

With this case coming close on the heels of *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), where the Court for the first time vacated a death sentence on grounds that it was excessive or unconstitutionally imposed by a sentencer other than a jury, it is not difficult for me to accordingly concur in the judgment of the Court in that respect. It is required of me, however, that in cases of this awesome magnitude certain observations should be made as to proportionality concerns where the Court has previously upheld the death sentence imposed on Scroggins' co-defendant Beam. *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985).

II.

The state's case against Scroggins involved an earlier considerable expenditure of time and effort in order that I could comprehend what transpired in *Beam*. There I wrote that simultaneous trials in one courtroom before one trial judge presiding over two separate juries, one for each defendant, was a noble experiment which failed. As my separate opinion took extreme pains to point out, appellate review of Beam's trial was impossible without going outside of the *Beam* record and into the *Scroggins* record in order to hopefully piece the puzzle together. In fact, the main portion of my *Beam* opinion was

concluded while laboring under the impression that Beam, after testifying as a state's witness against both himself and Scroggins in both trials, was not cross-examined by counsel for Scroggins. From *Beam:*

> MR. BISHOP: Your Honor, prior to cross-examination by Mr. White, I would ask that Jury A be removed. I feel this would be proper in light of the two-jury system.
>
> MR. JONES: May we approach the bench on that, Your Honor?
>
> COURT: Approach the bench. (Whereupon, an *off-the-record bench discussion* was had between Court and Counsel.)
>
> COURT: I am going to ask that Panel A step down. (Whereupon, the Bailiff escorted Jury A out of open court and *certain proceedings* were had in the absence of Jury A. The noon recess was taken from 11:45 a.m. to 1:30 p.m. Reconvened. Counsel for respective parties, together with the Defendants, present. The following proceedings were had in the absence of both Jury A and Jury B.) [*Beam,*] Tr., Vol. 4, pp. 838–62.

It will be forever unknown, at least by resort to the records on both appeals, what was agreed to by the court and defense counsel at the bench conference. All that we do know—from the record—is that counsel for the state, in the presence of both juries, requested and obtained an "off-the-record" bench discussion just prior to cross-examination of Beam by Mr. White, counsel for Scroggins. And *we do know that the "off-the-record" discussion took place, and there was not any cross-examination of Beam by counsel for Scroggins. We do not know what was said in that important bench discussion—the result of which was no cross-examination.*

What we also do know is that appellate review of an incomplete record is virtually impossible. As Justice Bakes wrote in his dissent to *State v. Wright,* 97 Idaho 229, 235, 542 P.2d 63, 69 (1975):

When this Court is unable to review the proceedings of the lower court because, in violation of the statutes of this state, the record of those proceedings was not properly taken and preserved, and due to the record's deficiencies we are unable to determine whether a defendant's judgment of conviction has been obtained in a proceeding tainted with fundamental error, then we must apply the rule of *Ebersole v. State,* 91 Idaho 630, 428 P.2d 947 (1967), where we stated:

> "Appellant's dilemma was not of his own making. The statutory provisions requiring the recording of oral proceedings by the court reporter ... are fairly designed ... to protect a defendant from the very situation now before this Court.
>
> . . . .
>
> "When there is such a breakdown in the application of established procedures, as is reflected by this record, which necessitated resort to the parol evidence of court officials and of the appellant himself to establish what took place in a court of record, there is such a lack of fundamental fairness and deviation from established rules of procedure as to necessitate the conclusion that appellant has not been afforded the protection of the due process clauses of the Constitutions of the United States and this State." 91 Idaho at 636, 428 P.2d at 953.

Continuing to believe from a record which did not disclose what transpired at the bench conference—a secret affair in a capital case—that Beam had *not* been cross-examined in Scroggins' trial, I wrote:

> Here, however, Beam testified. And he was accordingly subject to cross-examination by his co-defendant's counsel. In that way, and only in that way, "the search for truth" would have been promoted. The trial court, apparently seeing no difference between Beam's live testimony and the hearsay use of his oral

confession to the police officers, applied the *Bruton* rule to both. ["Both" meaning Beam's live testimony and Beam's confession.] *Beam, supra,* 109 Idaho at 633, 710 P.2d at 543.

And much further along, commented again:

But the larger problem is the trial court's administering of the *Bruton* rule, as it was here administered for the first time in Idaho, in a jointly-charged, jointly-tried, capital case with two juries— **COMPOUNDED** by the fact that both of the co-defendants testified and the very reason for the *Bruton* rule was non-existent. *Beam, supra,* 109 Idaho at 643, 710 P.2d at 553.

And, keeping well in mind that I was still laboring under a mistaken impression which would only be later corrected on going afield into the Scroggins record, also this:

What also comes across to me from reading the testimony of both defendants, and examining their statements given to the police detectives, is that Beam is as much the mentally slow person as was Bainbridge as compared Sivak. I would challenge anyone to read the testimony and statements and argue to the contrary. Yet, Bainbridge was not given the death sentence, but Sivak was, and Beam and Scroggins both were.

My purpose is not to say that the trial court erred in sentencing both to death. But I do suggest that *one* jury, hearing each testify on direct and then on *two* cross-examinations, might have well decided the issue differently than did two juries. *Beam, supra,* 109 Idaho at 644, 710 P.2d at 554 (reference to Sivak and Bainbridge—*State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983) *cert. denied* — U.S. ——, 104 S.Ct. 3591, 82 L.Ed.2d 887; *State v. Bainbridge,* 108 Idaho 273, 698 P.2d 335 (1985)).

Two pages later an Addendum pointed to the fact that the *Beam* reporter's transcript inaccurately failed to show that Beam had been subjected to cross-examination by Scroggins' counsel—a complete ful-

fillment of the otherwise problem of non-confrontation which produced the *Bruton* rule in the first place. What a comedy! It was the *Bruton* circumstance which the prosecutor, of all people, had utilized to obtain this peculiar hybrid severance.

What came out of it all was Beam testifying against Scroggins, who was indeed awarded the right of confrontation which was exercised by cross-examination (you cannot cross-examine a confession), and Scroggins thereafter testifying against Beam who was not accorded confrontation by cross-examination. Nevertheless by direct order of the court, Beam's trial being over, Beam and his attorney were confined to the courtroom while Scroggins took the stand and laid on Beam all the blame for the killing.

I mentioned early in the *Beam* opinion, first at p. 36 and again at p. 57, it was the prosecutor's worry that if Beam and counsel were not required to be present as the Scroggins trial continued on that "with lay members sitting on a very new law process, *that an improper conclusion could be drawn from the absence of Mr. Beam at this critical point.*"

Having first ruled that Beam and his attorney need not be present, the trial judge succumbed to the prosecutor's unexplained gut feeling of improper jury conclusions, and reversed his ruling. In the Addendum I pointed out exactly how this would appear to the jury:

When Scroggins testified, it was only because the trial court reversed its ruling that Beam and his attorney were even in the court room, ... but under the court's previously declared absolute control over the proceedings, ... sat there like dummies with Beam's attorney having no opportunity to cross-examine.

Just as the prosecutor had worried, the lay jurors did jump to a conclusion, and there is only one reasonable conclusion that the jurors could come to. Where those jurors had previously seen Mr. White, Scroggins' attorney, thoroughly cross-examine Beam, obviously those jurors would believe that Beam's attorney did not believe that he

could make any inroads whatever against Scroggins' direct testimony. *In other words, the jury saw Beam and his attorney offer not the slightest effort at challenging the testimony just given by Scroggins!* Otherwise put, Beam and his attorney were seen as conceding the validity of that testimony. This accounts for a jury verdict in Scroggins' trial which exonerated him from the actual killing and from the rape. It is as wrong as anything which I have witnessed in a criminal prosecution. Scroggins was clearly the beneficiary of the court's erroneous ruling, and it was the prosecutor who led the court into such grievous error. And in the first place it was the prosecutor who led the court into the error of attempting to conduct two "almost" separate trials in one courtroom with two juries.

There is little doubt in my mind, almost none in fact, that the prosecutor's cross-examination of Scroggins established him for the liar he was in first giving false statements to the police officers. But, with Beam and counsel apparently seeing no reason to cross-examine Scroggins, the jury, if so inclined where Scroggins was by them convicted of felony murder, could readily let itself entertain a reasonable doubt that Scroggins was not guilty of rape, and not guilty of actually killing or participating in the actual killing.

The jury has so ruled, and no matter how it was deceived and misled by appearances—*i.e.*, drew improper conclusions, as the prosecutor worried—nothing can be done in that regard. That verdict is final. The state has not challenged it, and no one else has standing to challenge it.

If there is to be any proportionality in death penalty sentencing, however, it is only just that the Court now pause to reconsider Beam's death sentence. And it can do so. In *State v. Ramirez*, 34 Idaho 623, 203 P. 279 (1921), the Court recalled its remittitur to further consider its earlier judgment which had affirmed a conviction of first degree murder and punishment *fixed by the jury* at death. *State v. Ramirez*, 33 Idaho 803, 19 P. 376 (1921).

Having recalled the remittitur, and upon further consideration, the Court stated:

> The questions involved here are of the utmost importance to appellant, and every consideration of justice demands that this court determine its power both to recall the *remittitur* and to reduce the punishment in this case, and that the punishment be reduced if the facts do not warrant the imposition of the death penalty. *Ramirez, supra,* 34 Idaho at 631, 203 P. at 281–82.

and declared its inherent power to do so, *id.,* at 631 203 P. 279. (It has done so in subsequent cases.) The Court was short and to the point:

> Without reciting in detail all of the facts and circumstances involved in the trial of this cause, and specifically pointing out errors which were not reversible, but which may have influenced the jury in assessing the extreme penalty, it is clear to our minds *that the jury abused its discretion in so doing.*
>
> We have, therefore, after very careful consideration, reached the conclusion that it is our duty to recall the *remittitur,* and to modify the judgment to the extent that the sentence to be inflicted be that of life imprisonment at hard labor in lieu of inflicting the death penalty, and the judgment is so modified.

*Id.* at 637–38, 203 P. at 284.

If this Court today is to display the quality of justice it showed in *Windsor,* and now in Scroggins' case, it will at least recall the remittitur in Beam's case so that it will afford itself the opportunity of considering the injustice which is being done by letting Beam be sent off to his death—while at the same time waving boldly the banner of proportionality while sending Scroggins off to a sentence less severe. If it does recall the remittitur, it will at the least establish to a somewhat doubtful bar that the other members sometimes read what my research reveals in these important cases of most grave consequence. As I intimated over three months ago in *Beam,* then not knowing how the Court would pass upon Scroggins' appeal:

What also comes across to me from reading the testimony of both defendants, and examining their statements given to the police detectives, is that Beam is as much the mentally slow person as was Bainbridge as compared to Sivak. *Beam*, 109 Idaho at 644, 710 P.2d at 554. As above observed, I mentioned the statements given to the police detectives by Beam. This was prior to his having any advice from an attorney, or from anyone. Freely admitting his complicity, as did Scroggins (who was the first one to go to the police and point the finger of guilt at Beam), Beam's mentality was such that not at all displaying any regard for his life which was then at stake, his prime concern was whether he would get back the cherished pair of handcuffs which he said his friend Shawn Scroggins had given to him. Observe the following excerpt from Beam's first statement to the police detectives made in Nevada after his apprehension— with a short lead-in to the handcuff affair:

BRISBIN: Do you feel mentally alert and normal and everything like that, normal?

BEAM: Yeah.

TWEDT: You know what you're doin', dontcha?

BEAM: Yes, I do.

TWEDT: Okay. Sh..or Ray, I'm sorry. We need samples of your pubic hair and head hair. Now, you don't have to give us it if you don't want to but I can guarantee ya when we get back to Idaho I'll get a court order and I'll pull it myself, so ...

BRISBIN: So step over ...

TWEDT: ....needs to be pulled by the follicle. The follicle needs to be with it. Your head hair though, Ray, we need that taken from several areas of your head. That piece there is from the right side toward the back. These can be in the same envelope. For the purpose of the tape, are you giving us these hairs voluntarily?

BEAM: Yes, I am.

TWEDT: Okay. Got some there, okay. now we ... maybe just a little out of the front here, alright. The time is 2310 hours. Ray, if you'll initial the bottom here that that is your head hair that I enclosed in that envelope. Just a few minutes here and I'll set up another pharmicist fold. Now, get some pubic hair. A little more than that, if you will. That should be sufficient. The pubic hair is also given voluntarily?

BEAM: Yes, sir.

TWEDT: The time is also 2310, 2312 hours now. And again, on this line here, Ray. Marshall, I forgot to sign that last envelope there. To these envelopes I am affixing the area form which the hair was pulled, the name of Albert Ray Beam, the date 7/9/83, the time that Mr. Beam has signed each package. Mr. Beam, you had certain property with you when you were arrested here in Lovelock.

BEAM: Yes.

TWEDT: Your clothes and any ... is that a gym bag?

BEAM: Yes, it is.

TWEDT: Okay, like a cotton gym bag.

BEAM: Yes.

TWEDT: Okay, certain pieces of that will probably have to be seized as evidence. I'd like to have your permission to seize those things..Again, I admonish you that you don't have to consent, I'll have to get search warrant to go into the bag if I have to. But if that's necessary, I guarantee ya I will do that too. You understand that?

BEAM: Yes, I do.

TWEDT: Okay. Would you voluntarily give me permission to seize articles of clothing or whatever I feel is necessary from that bag?

BEAM: Yes.

TWEDT: Okay. I'm gonna fill out a permission to search form and I'll have you execute that. Okay. The back side's in Spanish so it doesn't apply. Okay. I'm gonna read this to you, Ray. Permission to Search. The undersigned, residing at the Lovelock, Nevada Law Enforcement Building, that's your address right now. Anyway, has hereby

authorized Detective Gary Twedt, and other officers as he designates to assist him, to search my residence or other real property located at the property lockers, Lovelock Law Enforcement Building, and I further authorize said officers to remove from my residence, real estate and/or motor vehicle whatever documents or items of property whatsoever that shall be deemed pertinent to the investigation with the understanding that said officers will give me a receipt for whatever they remove. I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made and after having been informed by said officer that I have a right to refuse a search and/or seizure. I've crossed out the.. the lines applying to motor vehicles and that sort of thing here. They don't apply. All I'm interested in is the property that the law enforcement officers here seized from you. Okay? You understand everything?

BEAM: Yes, I do, sir?

TWEDT: Okay.

BRISBIN: Could we also, Ray, have permission to obtain your handcuffs?

BEAM: Yes.

BRISBIN: You indicated yes, right?

BEAM: Yes. Will I ever get 'em back?

TWEDT: That'll be up to the court, okay?

Because it has now become absolutely essential that Beam's sentence be reconsidered, I have revisited the majority opinion in *Beam.* My effort is to further consider Beam's intellect and his background, both independently and with an eye on that of Scroggins. The consideration given by the majority opinion is very limited. First, however, it has to be noted that the majority opinion, after reciting the facts of the murder, also crossed over to the *Scroggins* file in order to observe that: "the Scroggins jury found Scroggins guilty of first degree murder, finding that he did not commit the crime directly, but rather aided and abetted and/or encouraged and advised its commission, and found Scroggins guilty of

attempted rape." 109 Idaho at 619, 710 P.2d at 529. It was against *that* backdrop that the issues in Beam's appeal were considered, but I think not very much so. The opinion noted only that:

At Beam's sentencing hearing, testimony was offered by the State and the defense, the State calling three witnesses, the director of the Canyon County Detention Center (where Beam was incarcerated), a detention center sergeant, and one of Beam's prior cellmates. The defense called Beam. The trial court also had before it the presentence investigation and psychological evaluation reports. *That testimony indicated that Beam abused drugs, was on parole for burglary when the murder was committed, had been exposed to and participated in much sexually deviant behavior, had tortured animals, was impulsive, and lacked any adequate conscience.*

Following Beam's sentencing hearing, the trial court, pursuant to I.C. § 19–2515, found the existence of three statutory aggravating circumstances: (1) that the murder was especially heinous, atrocious and cruel and it manifested exceptional depravity; (2) that Beam had exhibited utter disregard for human life; and (3) that Beam, by prior conduct or conduct in the commission of the murder, had exhibited a propensity to commit murder which would probably constitute a continuing threat to society. The trial court considered six possible mitigating factors: *That Beam was 21 years old; that he had been mentally and emotionally deprived; that he had been cooperative with police and had admitted involvement in the crime; that he had limited employment skills as a cook and a mechanic; that he suffered from substance dependency; and that he was raised in a turbulent family setting. Beam, supra,* 109 Idaho at 619, 710 P.2d at 529.

Having now conducted my own review, I find that important items of information the district judge relied upon in sentencing

Beam included the following excerpts from the report of the presentence investigator:

Nampa Police Department detectives interviewed Beam at Lovelock, Nevada and Beam told the story that after he and Scroggins had arrived at the spot behind Safeways, Scroggins handcuffed Lenten, cut her panties off with a knife, and raped her. Beam said he then had sexual intercourse with the victim. When he was finished, Scroggins had the victim perform fellatio on him. Beam continued that Scroggins had the victim pull her pants up before handcuffing her hands behind her back and walking her to the canal. According to Beam, Scroggins held her head under water for a period of time and then asked Beam to hold her head for awhile. Beam said he pulled the victim up and resuscitated her before Scroggins pulled the victim back to the canal and slit her throat. Beam said that because he could not stand the sight of blood he held the victim under the water until she quit moving.

In comment to this investigator, Lieutenant Riley Newton, the Chief Investigator for the Nampa Police Department, states that he was impressed with the fact that Beam's version of the crime matched so close to the physical evidence. On the other hand, Newton feels that Scroggins' story kept shifting and never closely matched the physical evidence. Newton's investigation revealed collateral information that Scroggins was known as a "knife nut" while Beam was not known for violence or handling knives. He feels that Scroggins was the instigator of the murder while Beam was the follower. Newton believes everything about Beam's version except for the part where Beam maintains he tried to resuscitate the victim with CPR. Newton feels the entire act was not premeditated but happened moment by moment on impulse.

Detective Creech of the Nampa Police Department, also feels that the defendant has been truthful regarding his version of the offense. It has been Detective Creech's experience that the defendant is only untruthful when he is certain that he can "get away with it".

Because Beam's version fit extremely close to the physical evidence and Scroggin's version was filled with large discrepancies, (for information on said discrepancies please refer to the transcripts of police interviews with Scroggins) Scroggins was arrested for First Degree Murder.

. . . .

SIGNIFICANT FAMILY INFORMATION: The defendant was born in 1962, the third child of four children conceived by Harvey and Louella Beam. Beam relates that the first ten years of his life were stable and "normal." During that period of time, the family lived on a ranch in the Sunny Slope area and Beam's father worked on that ranch. Beam's father then injured his back and was terminated for no longer being able to handle the ranch work. Beam states that his family's life-style radically changed from that point on. Beam, however, does relate one aspect of his life, at the age of nine, which would indicate a potential for violence. According to Beam, there were "thousands of cats" on the ranch. Beam hated those cats because "they'd growl or scratch you." Because of his hatred for cats, Beam would spend a lot of time planning how to kill them. Oftentimes, Beam would pour gas on them and then light them on fire. He would also tie their tails together, hang them over a clothesline, and let them fight until one or both of them were dead. He was also fond of hanging them by the neck or exploding firecrackers in their anal cavities. For the next few years Beam's father worked as an automobile mechanic at various jobs but was unable to be successful at any job due to his back problem. He was finally labeled terminally disabled and during this time he developed a severe alcohol problem. Also during this period of time, the defendant's older brother, _____, got married and moved to Caldwell. Beam reports that he never had too much contact with his older brother because he kept to himself and did not relate with the family on a regular basis. At the age of 11, Beam had

his first sexual encounter when he and a female cousin watched his older brother engage in sex with his wife. At that time, he and his cousin had sexual intercourse. He relates that they had sexual intercourse four to five times over the next two years. By the time Beam was 14 years of age his father was drinking from the time he got up in the morning to the time he went to bed. Beam's father was also having sexual intercourse with Beam's sister. Mr. Beam would sell [the daughter's] sexual favors to various males in return for money, car parts, or alcohol. Beam's father also forced Beam and his severely retarded brother, _____ (two years older than Ray), to have sex with their mother while he watched. (This statement is uncorroborated except that collaterals suspect that sexual swapping of family members took place.) Beam maintains that his mother was not in favor of this but if anyone refused, Harvey Beam would beat them. Beam states that his father did not attempt to have sex with him or his brother. Furthermore, at the age of 14, Beam impregnated a girl and conceived a boy whom he has never seen. That year Beam began experimenting with various types of drugs and began drinking. (For more specific information, refer to the substance abuse section of this report.) At age 15, Beam's behavior became even more bizarre. Once, on a dare from his sister, he took all of his clothes off and walked down the street in the daylight hours and he started going to parties where he would do stripteases. He would also engage in giving dogs and cats alcohol until they were intoxicated. He further related that he considered having sex with one of his father's dogs but when he went to grab her to take her into the bedroom she started growling so he gave up on the idea. He says he never again considered having sex with an animal. As Beam's drug use became heavier, he found that in order to buy the drugs he wanted, he needed but to wait until his father passed out from alcohol consumption to steal money from him. Discipline at this time became severe and Beam says on three or four occasions per week, his father

would beat him with a rubber hose or a razor strap. At age 15 Beam's father knocked him down a flight of stairs and he ran away from home. Beam says that he then went to a foster home for six months before asking to go back home. (Child protection workers claim this time with the foster family was only two months and had no impact on Beam.) Upon returning home, Beam found himself following his father's alcoholic pattern. Beam claims that the major source of contention with his father were the conflicts concerning Beam's girl friends. Beam states that his father either bribed or intimated his girl friends to have sex with him. During Beam's 16th year all discipline broke down as Beam told his parents that from then on he would do what he wanted to do. Also during this year [Beam's sister] went to live at a foster home. At age 17 Beam became engaged to a [X]. Ms. [X] had three children and they lived together for seven months before splitting up when she pulled a knife on him and he struck her with his fist. Next, Beam cohabitated at his parents' house with a [Y]. Ms. [Y] left after three months without giving an explanation to Beam as to why she was leaving him. During this time span, Beam reports that he did some farm work for a [Z]. Beam relates that he and Mr. [Z] developed a homosexual relationship which lasted for about one year before Gonzales moved out of the area. Beam states that he enjoyed this relationship as he was tired of being hurt by women." Before going to prison at the age of 19, Mr. Beam lived for indeterminate amount of time with a woman known as Freedom. (Refer to the marital section of this report.) Beam thinks of his childhood as having been completely miserable and he feels that his father deliberately set out to destroy his happiness. When asked about any happy family occasions, Beam reported that on three to four occasions per year the family would have a nice time when they went camping and fishing. Beam is also appreciative of his father for teaching him automobile mechanics.

Concerning his siblings, Beam reports that he has always been exceptionally close to his sister. He related that while she wanted to engage in sexual intercourse with him, he would not allow any sexual contact between them. Beam state that he and [his sister] confided and counseled each other and if they had not been siblings, they would be married. Beam never had to much contact with [his older brother] as [he] moved away when Ray was very young. Beam is aware that [his older brother] would occasionally have sexual intercourse with [his sister]. _____ is severely retarded and Beam does not relate a close relationship with him. At the urging of [Z], however, Beam did have one homosexual encounter with his brother. Beam was not satisfied with the sexual encounter and he would not allow other sexual encounters with his brother. Beam states that [this brother] prefers homosexual encounters to heterosexual encounters.

. . . . .

EDUCATION: The defendant's school file was obtained through the Nampa School District. It was found that the defendant had to repeat the first grade. In the fourth grade, his teacher referred him to the school psychologist because he was engaged in fighting with peers, had difficulty doing school assignments and exhibited slow speech. Beam was seeing a speech therapist but the therapist discontinued her work with Beam because she claimed Beam "belligerently refused to cooperate in therapy and would not practice at home." Beam's IQ score on February 6, 1973 was 87.... [T]he grade level of 2.5 while he read at the grade level of 1.9. She classified him "dull-normal" But did not feel he was severe enough to enter special education. Emotional indicators suggested that Beam had tendancies to be "impulsive, aggressive and to act out." (Please refer to a copy of this report attached to the presentence.) In the seventh grade Beam was again referred to ... the school psychologist, because of further difficulties in school. On 9–23–75, Beam's IQ measured 77. His reading level was grade 2.4, his spelling level was grade 2.9, and his arithmetic level was grade 2.9. His performance on the Bender-Gestalt test was typical of a six and a half year old child. Beam was then placed in special education. (Refer to the report attached to his presentence.) Beam continued in special education at West Junior High School until 9–5–78 when he dropped out. He went back to school on 9–2–80 when it was decided to move him to the special education department at Nampa High School. On 9–18–80, he dropped out of school for good.... [T]he Special Education Administrator for the Nampa School District states that she worked very closely with Beam and was in his home on many occasions. [She] states that the Beam home was the dirtiest home she had ever been in. She reports that the defendant was so dirty and smelled so bad that his peers "tormented him." She relates that Beam was involved in a fight nearly every day. The only thing that stopped this daily routine of a fight was if Beam happened to be able to wear a clean shirt. When [she] was at the Beam residence, she noticed that the family members wore almost no clothes. On one occasion, [she] approached the door and noticed that the defendant was involved in sexual intercourse with an unknown female on the front porch. When Beam noticed her, he waved her through and said nonchalantly that he would be with her in a minute. [She] reports that she knew Mr. Beam was raping [the daughter] but she also suspected a lot of other "sexual swapping" among the family members. [The Administrator] also suspected that outside of the home Beam was engaged in various homosexual relationships. [She] reports that Beam was not retarded but was slow due to his poor home environment. [She] remembers Beam as a "good-natured person who was easily frustrated when picked on by other boys."

. . . .

(c) ABUSES (ALCOHOL AND/OR DRUGS): The defendant states that when he was 14 years of age he started using marijuana and amphetamines on a regular basis. By the time he was 16 years of age,

he was drinking heavily on almost a daily basis. Also that year, he began selling marijuana, amphetamines, and barbituates. He states that he usually earned about $300.00 per month selling drugs but gave it up because he felt the Nampa Police Department was investigating him. The year before he went to prison, he was ingesting LSD on an every other day basis. That year he experimented with LSD for three months. He also began ingesting PCP once a month, smoked marijuana about every day, and experimented with cocaine and various amphetamines. Furthermore, the defendant relates that he would drink a fifth of McCarty whiskey every day. In prison, the defendant attended Alcoholics Ananymous and Narcotics Anonymous on a regular basis. He reports that upon his release from prison he wanted to quit using drugs and alcohol but could not do this due to pressure from his father and various friends. He states that following his prison release he drank a half a case of beer and smoked marijuana on a daily basis. He reports to me that he smoked marijuana laced with PCP just prior to the commission of this murder. Prior to our interview, however, he continually reported that he was only slightly intoxicated from the use of marijuana.

. . . .

The defendant apparently had little or no model concerning the value of personal ownership. It appears that personal possessions must have been obtained and held through the idea of "survival of the fittest." Beam reports that he had the feeling that his father wanted whatever he had. When the defendant was quite young, he set a pattern for himself by stealing from his father after his father had passed out from alcohol consumption.

Apparently the defendant also did not have a significant role model regarding the work ethic or the value of self-sufficiency and financial responsibility. When the defendant was ten to 11 years of age his father became disabled and instead of learning a new trade he became content to collect a disability check and other forms of welfare. Furthermore, Mr. Beam spent most of his welfare money on a $50.00 a day alcohol habit. Because of this, Health and Welfare child protection workers had reports that the Beam family subsisted on food collected from garbage cans.

Beam's father further presented to the defendant the norm of life lived in an intoxicated state. Beam reports that for eight to ten years his father was intoxicated nearly every waking moment. Beam felt that the only way he could coexist peacefully with his father was to get drunk with him. From this, Beam developed a severe drug/alcohol dependency and he supported this dependency largely by stealing from citizens of Canyon County.

Finally, Beam's parents exhibited the complete lack of care concerning their physical environment. The family's residence were filthy beyond belief and there was little or no instruction concerning personal hygiene. The children were allowed to go to school with dirty clothes and a severe body odor which offended their peers. Also, the lack of a proper diet must have had some bearing on the defendant's downward spiralling IQ.

All the above-mentioned environmental factors first caused the defendant to be soundly rejected by his peers. One collateral used the word "tormented" when she described how Beam's peers treated him. The defendant was then, of course, forced to band together with other outcasts, many of whom were engaged in crime.

The second affect of the defendant's environment must have been an imprinting on him of the norm of immediate self-gratification. The defendant had little or nothing in his experience to teach him about caring for other people. Because of this, we see the defendant has engaged in a life of using people to meet his needs.

The biggest problem with the why's of this case lies with the defendant himself. Most collaterals understand that the defendant is a social outcast, a substance abuser, and a thief. All collateral contacts are extremely surprised as to his involvement in a violent crime. He is described as

a clownish, good-natured, nonaggressive person. Why this supposed new twist to his character? Despite reports from collaterals we can, however, see flashes in the defendant's life which would indicate a possibility of violence. He tortured cats, he fought nearly every day at school, he physically fought with girl friends, he reported that people were trying to kill him, he engaged in fighting the person he perceived as being a romantic rival, he was noted to have an aggressive nature by a school psychologist, and he talked of killing people he was angry with. Shortly after the arrest of the defendant, [a] minor child called the police and stated that on the afternoon preceding the crime Beam and Scroggins arrived at her home and stated they were going to kill someone. Beam stated that he was angry and wanted to kill someone with a baseball bat.... Much of the above noted violence was not instigated by the defendant, but nevertheless, he was still involved with more violence than most of us have to live with. It appears that the defendant lived with a great deal of pent-up anger. To get a clearer picture of the defendant, we can apply the above-mentioned experiences to Dr. Webb's psychological report. The report indicates the defendant has the inability to feel with others, the inability to experience normal guilt, an impulsive nature, and feelings of hostility. The facts of this presentence seem to support Detective Newton's theory that the defendant went along with what was happening, was unable to feel for the victim, and finished the job of murdering her.

The defendant's social pathology would seem to be extremely deep-rooted. The fact that he is passive, aggressive, nonempathetic, impulsive, and relatively guilt free would seem to leave the door open to about any type of behavior. No person predicted that the defendant would be involved with this type of crime but it appears to this writer that the probability always existed. It is also my opinion that the defendant's personality and life-style would make it possible for him to commit similar crimes in the future.

In concluding Part II, I return to my *Beam* opinion, where, long before we took up Scroggins' appeal, I observed "that *one* jury, hearing each testify on direct and then in *two* cross-examinations, might have well decided the issue differently than did two juries." 109 Idaho at 644, 710 P.2d at 554. To that I now add that the prosecutor in his argument that the death penalty be imposed upon Scroggins recognized that Scroggins had connived for Beam's fleeing from Idaho, whereafter Scroggins would go to the police and inform them of the murder which Beam had perpetrated. The prosecutor, well aware of Scroggins' lies, some of which he had clearly demonstrated by adept cross-examination, also urged such considerations on the court. Briefly, but highly pertinent, this:

[T]here is but one conclusion: that is that he was there, he assisted in that murder right to its very end and then *later, upon realizing there were other witnesses, began an elaborate scheme to trap Albert Ray Beam into this crime and free himself.*

Time and time again he has lied in this case; lied to protect himself, lied to make himself look good, he has lied to the jury, he has lied to this Court, he has lied to the presentence investigator. The only time he tells the truth is when the truth happens to be of his assistance. Tr., Vol. 6, p. 1419 (emphasis added).

In summing up to the Scroggins jury, the prosecutor earlier contended:

And Mr. Scroggins did go to the police. I'll talk about why he went to the police. What did he talk about when he went to the police, when he talked about everything that Ray did, Ray did this, Ray did that? He said, "I moved off to a tree and couldn't look." He didn't go for any help. He didn't attempt to stop this. He said he was too frightened to stop it. He was too frightened to stop Ray, too frightened to run for help.

But he wasn't too frightened to step in and take his turn. And in his words, "I started to take my turn." He wasn't so

frightened of Ray that he wouldn't drop his pants down. He said he was too afraid to stop him or run away. I ask you to look at all of the evidence that came out concerning any threats between these two.

I believe that when you do that, you will come up with nothing, because they were friends. They did these things together. They were good enough friends to be out together that night, to be trading property, to be meeting girls and doing whatever else it is they did together.

So he goes in and tells the police he didn't have anything to do with it. He said Ray handcuffed her behind her back and took her down. Then he said—I belabored this point a little bit because it was important—then he said over and over, "I saw what happened. He drownded her. He put her in the water."

And they asked him specifically, "Just her head?" And he answered, "No, her whole body." And they asked him, "Did you actually see this?" And he said, "I saw it."

"Did you actually see it?" "I saw it," until finally the police were fed up. They went out there at night, and then they said, "Shawn, you can't see from there. You can't see down to there from where you said you were. How do you have such an accurate description that she was held under the water until she drowned? How do you know what happened down there, Shawn, you can't see from there?"

. . . .

The Mr. Twedt suggested, "Maybe you saw it in your mind's eye." And then, of course, he says, "Yes, in my mind's eye I saw it. When," he said, "I heard it, I saw it." But it was pretty good guess for him to take him right to the body. He couldn't look down. He knew that the body was there. He'd been there. He'd seen it. He knew where they were going to find it.

He talked about knives with the police officers, but not at first. There was no mention of knives whatsoever at first. This didn't come out in the first interview, not until they said, "Shawn, we know that the girl's throat was cut." Then his memory gets better. "Oh, yes, Ray had the knife. Ray put it to the girl's throat." Ray did everything.

If he remember that so well, why didn't he tell them that at then very first, unless he didn't want to connect himself with the knife? Even though everyone knew that he owned it, he wanted to make it look like Ray did it all.

. . . .

What did Short and Lequita McWhirter talk about at that time? They clearly talked about the plan. They had to get Beam out of town. They had to get Scroggins down to the police station to put it all on Beam, to put all the blame on Beam. Why? Because Victor Matthews had seen Scroggins. He had seen him with the knife, with the handcuffs. He couldn't say he didn't have anything to do with it. They had seen him.

They had to get Beam out of town. Then they could blame it on him while he was gone. And that was the advice that Wes Short gave. He told Ray, "You've got to get out of town. You've got to get out of town or commit suicide or turn yourself in." Who's going to do that? So he got him out of town. He drove him over there to Caldwell, and Scroggins went with them. Then in a two-hour period they showed up at the police department with this story they have. Tr., Vol. 6, pp. 1289–1301.

The Court's opinion places a considerable reliance on *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1, quoting extensively from it. I do not disagree that this is correctly done. In this area of criminal law the High Court has occupied the field, having in the first place opened the field with its *Furman* and *Woodson* opinions. If Scroggins has a valid issue under *Eddings,* then it is in order that we do not duck it. And we do not. Our opinion notes that Scroggins, with a mental age of 13.8 years, was in his formative years super-

vised by the Department of Health and Welfare because of his unstable, unnurtured and inadequate upbringing, and that although he had reached the age of 18 years, "We cannot ignore the [*Eddings*] Court's admonition that 'youth is more than a chronological fact.'" 110 Idaho at 388, 716 P.2d at 1160. Our opinion notes that "Just as Eddings was not a normal sixteen-year-old, Scroggins was not a normal eighteen-year-old. Like Eddings, Scroggins had been deprived of the 'care, concern and parental attention that children deserve.' Also like Eddings, Scroggins' mental and emotional development were at a level well below his chronological age."

To which I add, everything which has been said about Eddings and Scroggins is applicable to Beam. If anyone has had a more miserable, pitiful, disgusting and deplorable early life than Beam, that person is not Eddings and it is not Scroggins. Beam, as true of Scroggins, simply did not have the mental wherewithal to make the decisions we expect of a normal properly brought-up person. Moreover, there is extremely good reason to believe, as apparently did the prosecutor and the presentence investigator, that Scroggins was the liar and the schemer who both murdered or participated in the murder and set Beam up to take the rap.

Notwithstanding that Scroggins failed to pin all the blame on Beam and was himself convicted of felony murder by reason of being accessory thereto, and sentenced to death, it certainly is the law that neither the trial court nor this Court can make findings contrary to the verdicts of the jury, and base a death sentence on such contradictory findings. Nor in this case was it proper for the Court to impose the death sentence upon Scroggins where the sentencing decision was in part based upon the proposition that:

> The nature of the crime, your age, your intelligence level being in the dull-normal

range, your physical, mental appearance, your ingrained sexual fantasies, your abnormal behavior would assure, in my judgment, your being victimized in the penitentiary by other inmates unless you were kept confined and away from other inmates, in and of itself a source of cruel and unusual punishment because of the constant confinement. 110 Idaho at 389, 716 P.2d at 1161.

As I stated earlier, I am not troubled in joining the Court's judgment to set aside the death penalty. I am greatly troubled that in Beam's case the opinion for the Court did not concern itself with the same considerations. The goal of proportionality is not advanced by the extreme appellate disparity in the treatment of the two cases.[1] The only conclusion now possible is that the convictions in both cases should be reversed, as each of the defendants has requested, and both defendants should stand jointly charged, as they first were and always have been, and should be jointly tried at a trial before one judge and one jury—and thereby let one jury determine which of the two, if either, is less culpable than the other. There is and was no *Bruton* circumstance. And, of course, that one jury properly would hear matters in mitigation and aggravation which would be admissible—which is not presently the way things are being done.

### III.

The trial court at the sentencing hearing found that the murder of the thirteen-year-old girl was especially heinous, atrocious and cruel manifesting exceptional depravity. With this finding one would not expect any disagreement. But the court went on to further find that by the murder or circumstances surrounding its commission, *the defendant exhibited utter disregard for human life.* The defendant referred to, of course, was none other than Shawn Scroggins. The jury had previously returned its verdict finding Scroggins guilty of *attempted* rape, not guilty of using a

---

1. When I wrote that the Court should recall the remittitur in Beam's case, I was under the impression that Beam had *not* petitioned for a rehearing. I have since been made aware that Beam *has* filed a petition for rehearing, and a few days ago filed a supporting brief.

knife while engaged in criminal activity, and guilty of first degree felony-murder only by reason of having been an accessory.

Toward the close of the sentencing hearing, the prosecutor argued:

Lastly, I would ask the Court considering the aggravated statutory circumstances to consider subsections 5 and 6. The murder was exceptionally heinous, atrocious, cruel, manifested exceptional depravity and exhibited utter disregard for human life. The court has had an opportunity to look at the exhibits in this matter, the ones that show beyond a reasonable doubt the facts supporting this conclusion in subsections 5 and 6 are exhibits 61 through 67, exhibits 43 and 34. The cuffs, the knife, the picture of the bruises and the pictures of the throat slitting....

She [the victim] was taken to that waste canal, a struggle ensued, the knife was present, and her throat was cut four to five times. All this while, the evidence shows that Shawn Scroggins was there. His footprints are there, he described the scene, he could not have known with the exactness he knew the events at that scene if he had not been there. The evidence clearly showed that at that point where he claimed to have stood was substantially outside of the murder scene.

What he did there at the water's edge was that he assisted in that murder, whether he held Mondi Lenten under water 2, 3 or 4 times, whether he waited for Albert Beam to give the final death blow, whether he gave that knife, whether he encouraged Albert Beam, there is but one conclusion; that is that he was there, he assisted in that murder right to its very end and then later, upon realizing there were other witnesses, began an elaborate scheme to trap Albert Ray Beam into this crime and free himself.

As a preliminary matter, it is clear that in the context of *this sentencing* of Scroggins, the two aggravating circumstances separately described in I.C. § 19–2515(g)(5)

and (g)(6), duplicate each other. The prosecutor implicitly recognized this by completely combining the two factors together in his argument. All of the "facts" he relied on to support a finding of one factor, he also relied on to support a finding of the other factor. Where, as here, the very facts which are argued in support of a finding of one factor are *identical* to the facts urged in support of a finding of the other factor, the two factors overlap and should be considered as only one aggravating circumstance.

More importantly, a careful review of the prosecutor's arguments and alleged "facts" in support of his urging the Court to find aggravating factors pursuant to (g)(5) and (g)(6) reveals that much of his argument was based on innuendo, speculation, and inferences many of which were in contradiction of the jury verdict. The prosecutor repeatedly drew the court's attention to the knife and the pictures depicting the victim's slashed throat. *The jury acquitted Mr. Scroggins of using a knife.* Hence, by repeatedly pointing to the "wicked looking" knife and emphasizing the wounds resulting from the use of a knife, the prosecutor was, in effect, encouraging the judge to disregard the jury's verdict of acquittal as to the use of a knife enhancement and, to instead, substitute his own judgment that Mr. Scroggins did use the knife. No authority permits a trial judge, in sentencing, to find facts in contravention of a jury verdict.

Clearly, the evidence adduced at trial established that Scroggins at one point handcuffed the victim. It is also true that the jury found that Scroggins had attempted to rape the victim. However, as the prosecutor pointed out, Scroggins and Beam had the victim at their mercy. Had Scroggins wanted to, there would have been no reason he could not have committed rape itself. The jury, by returning a verdict of guilty as to *attempted rape*, necessarily believed Scroggin's testimony that he did not proceed with the rape. Just as clearly, Beam's testimony to the contrary did not

convince the jury beyond a reasonable doubt that Scroggins had raped the girl.

Certainly, the evidence also reflects that Scroggins was at the scene of the crime. He not only admitted his presence at the crime scene, but reported the crime to the authorities on the following morning and insisted upon taking them to the murder scene. Hence, as to *Scroggins* involvement in the murder, the evidence which his jury accepted reflects only that he accompanied Beam and the victim to the creek, that he handcuffed and attempted to rape her, that he did not in fact proceed to rape her, that although he *owned* the knife used *he* did not *use* the knife, and that he reported the crime the following day. While these facts are clearly sufficient to support the jury verdict that Scroggins aided and abetted a felony murder, it does not follow that the evidence established beyond a reasonable doubt that *Scroggins'* conduct was within the requirements of I.C. §§ 19–2515(g)(5) and (g)(6).

In *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), this Court concluded:

> heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with uttered indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

Although the circumstances surrounding the murder and the murder itself *were* heinous, the *particular acts* justifying that conclusion were not attributed to Scroggins by his jury. While Scroggins' acts justify the verdict of first degree murder, they do not fulfill the requirements of I.C. §§ 19–2515(g)(5) and (g)(6).

Equally clear, while keeping well in mind the jury's verdict, the trial court erred by finding an aggravated circumstance by virtue of the murder being one defined as murder of the first degree under I.C. § 18–4003(d) *accompanied with the specific intent to cause the death* of a human being.

I.C. § 19–2515(g)(7) provides:

> (g) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed:

> .     .     .     .     .

> (7) The murder was one defined as murder of the first degree by § 18–4003, I.C., §§ (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being.

In another situation, when a murder is committed in the course of the perpetration of an inherently dangerous felony *and* it is found that the defendant intended to cause the death of a human being, the statute provides that such a finding is an aggravating circumstance justifying imposition of the death penalty.

In *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the United States Supreme Court held that the eighth amendment does not permit imposition of the death penalty on one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." Hence, under *Enmund,* a felony murder killing is not an offense which may be punishable by death unless a finding is first made that a particular defendant had the specific intent to kill.

I.C. §§ 19–2515(c) and (d) provide:

> (c) Where a person is *convicted of an offense which may be punishable by death,* a sentence of death shall not be imposed unless the court finds at least one (1) statutory aggravating circumstance. Where the court finds the statutory aggravating circumstance the court shall sentence the defendant to death

unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstance found and make imposition of death unjust. (Emphasis added).

(d) In all cases *in which the death penalty may be imposed,* the court shall, after conviction, order a presentence investigation to be conducted according to such procedures as are prescribed by law and shall thereafter convene a sentencing hearing for the purpose of hearing all relevant evidence and arguments of counsel in aggravation and mitigation of the offense. At such hearing, the state and the defendant shall be entitled to present all relevant evidence in aggravation and mitigation. Should any party present aggravating or mitigating evidence which has not previously been disclosed to the opposing party or parties, the court shall, upon request, adjourn the hearing until the party desiring to do so has had a reasonable opportunity to respond to such evidence. Evidence admitted at trial shall be considered and need not be repeated at the sentencing hearing. Evidence offered at trial but not admitted may be repeated or amplified if necessary to complete the record. (Emphasis added).

Therefore, the court must make *two separate and distinct findings,* the first of which must be made *before* the death penalty can be considered. In the first step the court must ascertain whether the offense of which the defendant stands convicted is one "which may be punishable by death." As explained in *Enmund, supra,* a felony murder killing is not such an offense *unless the defendant himself killed, attempted to kill or intended that a killing take place or that lethal force would be employed.* Therefore, the district court must *first* determine whether the defendant had so acted or had such an intent. If the court cannot make such a finding the defendant does not fall within that class of persons "convicted of an offense which may be punishable by death" as set out in I.C. §§ 19–2515(c) and (d) above. If, however, the court finds that the defendant did

so act or had such an intent to kill, only then does the court proceed to the next step, that requiring that the court find at least one (1) statutory aggravating circumstance.

In light of *Enmund* and I.C. §§ 19–2515(c) and (d) it is clear that a verdict of felony murder coupled with a court's finding that the defendant had the specific intent to kill a human being pertains only to the *first* step in the process and *should not be reapplied to the second step.* Our statutory scheme requires that once a criminal defendant is death penalty eligible at least *one* aggravating factor must be found. Since the word "aggravate" means "to make worse, more serious, or more severe," obviously the aggravating factor must be *something more than the basic unaggravated offense.* Since federal law requires a finding of specific intent as a *condition precedent* to imposing the death penalty on one convicted of felony murder and since Idaho law requires that an *additional* aggravating factor must be found where a criminal defendant is "convicted of an offense which may be punishable by death," it is fundamentally unfair to permit the very circumstance that makes the defendant death penalty eligible (i.e. having the specific intent to cause the death of a human being) also operate as a circumstance in aggravation. *In other words, the very finding that makes a defendant eligible to have the judge consider which aggravating factors apply should not again be used to justify the imposition of the death penalty.*

We must remember that a defendant convicted of a felony-murder does not come within that class of persons upon whom death can be imposed *unless* the court *first* finds that the defendant had the specific intent to kill. If it is the specific intent to kill which makes the defendant eligible to be considered for the death penalty and thereby requires the court to consider the statutory aggravating circumstances; it is improper to use that same specific intent as one of the aggravating factors.

In the present case, Scroggins was convicted of aiding and abetting a felony murder. The jury found that Scroggins did not directly commit the crime but aided, abetted and encouraged its commission. As the *Enmund* Court declared, aiding and abetting a felony murder without the specific intent to kill or intent that a killing take place or that lethal force will be employed does not, under any circumstances, permit imposition of the death penalty. For a felony-murder to be the type of offense which will make the defendant eligible for capital punishment, a finding that the defendant had the requisite specific intent is a preliminary and indispensable step to any further inquiry as to aggravating circumstances. Hence, to the extent that I.C. § 19–2515(g)(7) is denoted as a "statutory aggravating circumstance" such denotation is inaccurate. A finding of felony murder coupled with a further finding the defendant had the specific intent to kill operates to place a criminal defendant in that class of persons "convicted of an offense which may be punishable by death" but, because that finding is necessary to place the defendant within that class of persons, it cannot be repeated for purposes of finding an aggravating circumstance. Therefore, where a defendant stands convicted of felony murder and the court finds the defendant had the specific intent to kill or otherwise meets the *Enmund* standard, I.C. § 19–2515(g)(7) should not be deemed an aggravating circumstance. I would hold that in such a case, the court must find at least one, of the *other* factors beyond a reasonable doubt in order to impose a sentence of death.

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice.

The Solicitor General of the Attorney General's Office, by petition for rehearing and supporting brief, has urged upon us that the opinion of the Court, besides being in conflict with previous cases and contrary to legislative intent, creates an unwarranted new standard of factual review, which standard is at odds with the facts, and, moreover is inconsistent with *Cabana v. Bullock,* —— U.S. ——, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), which decision in point of time followed the release of *Scroggins.* In particular, the Solicitor General suggests that under *Cabana* this Court should uphold "the trial court's conclusions respecting the personal culpability of Scroggins" notwithstanding the verdict of the jury to the contrary.

Without mentioning that *Cabana* became the opinion of the High Court on the expediency of the Chief Justice joining it to make a majority of five, as against four dissenters, the Solicitor General has asked us to embrace its holding and grant a rehearing toward the end result that Scroggins may have the same opportunity to suffer execution as now awaits Beam. The Solicitor General concludes the State's evaluation of the situation:

A codefendant in this case, Albert Ray Beam, has been sentenced to death and his death sentence upheld on review. Respondent believes the present defendant is equally, if not more, culpable.

My separate opinion in *Scroggins* may have helped in the formulation of the state's contention that Scroggins is the more culpable of the two, and certainly not less culpable than Beam. But, wholly unmentioned by the Solicitor General is my suggestion that if Scroggins has been spared, then social justice requires that the less culpable Beam likewise must be spared— else the whole concept of proportionality be turned upon its head. What my earlier *Scroggins* opinion suggested as to Beam's fate and total failure of proportionality, even as between these two defendants, has now fully materialized. In the view of many practitioners it is believed that the State—in the office of its attorney general—should be the leader in the quest for as much justice as attainable. Proportionality is a key factor where justice is concerned.

"No" is my vote on the state's petition for rehearing. Just as it did in *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985) (petition for rehearing denied), the

Court this day does well to reject the Solicitor General's invitation to declare ourselves bound by every move which the High Court may make in its high stakes chess game. We are well-guided by the remarks of (then) Chief Justice Shepard, with Justice Donaldson concurring, eight years ago:

> In my judgment, this Court today errs in accepting at face value, without sufficient analysis, what a seriously divided United States Supreme Court purportedly stated in *Woodson*.... Mr. Justice Rehnquist states: "The Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed." See *Lockett v. Ohio, supra,* (Rehnquist, J. dissenting). Mr. Justice White, in *Lockett,* has described the Court's "about face." ...
>
> ....

All of this leads to a consideration of *Woodson* held by today's majority to be controlling. There three members of the Court join in an opinion which, for some reason, is denominated the "plurality." That "plurality" opinion states clearly "we reject *this argument* [that "the imposition of the death penalty is cruel and unusual punishment"]. 428 U.S. p. 285, 96 S.Ct. 2978. Two other members of the Court disagree with that view and state that the death penalty is a cruel and unusual punishment under any circumstances. Three other members of the *Woodson* court dissented and joined with White, J., in voting for affirmance of the court below. Blackmun, J., dissented on the basis of his "excruciating agony of the spirit" expressed in *Furman.*

What madness is this that denominates such thought process by some members of that Court as the "law of the land" and enjoins on those of us in the law not only the task of attempting to understand, but the clear duty and responsibility to apply its result and "reasoning."

....

With all deference and respect to our brethren on the Bench of the United States Supreme Court, I regret that I can neither understand what they have said as a court, where they now stand as a court or where they may be going in this important area of the law involving capital cases and the death penalty. *State v. Lindquist,* 99 Idaho 766, 773-75, 589 P.2d 101, 108-10 (1979).

*Presnell v. Georgia,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978), was decided *less* than eight years ago. That is a very short time in the course of a human life, generally, and even much shorter where the life span under consideration is that of a holding declared by the Supreme Court of the United States.

The *Presnell* case is deserving of the closest attention, as it was a stumbling block in the way of the *Cabana* decision—but not too much of an obstacle for five of the justices. Georgia utilizes a two-trial procedure in death penalty cases. The jury first hears and determines the guilt-innocence trial, and then hears evidence and imposes sentence at the penalty trial. The High Court's per curiam opinion in *Presnell,* on *certiorari* from the Georgia Supreme Court, is deserving of close consideration:

PER CURIAM

> Petitioner was indicted and found guilty by a jury of three capital offenses —rape, kidnaping with bodily injury, and murder with malice aforethought. Under Georgia law, a jury may impose the death penalty if it finds that the offender committed a capital felony under at least 1 of 10 statutorily enumerated aggravating circumstances. Ga.Code § 27-2534.-1(b) (1975). The only such circumstance relevant here is that
>
> "[t]he [capital] offense ... was committed while the offender was engaged in the commission of another capital felony...." § 27-2534.1(b)(2).
>
> At the penalty phase of petitioner's trial, the jury was instructed that it could impose the death penalty (1) for rape if that offense was committed while peti-

tioner was engaged in the commission of murder, (2) for kidnaping with bodily injury if that offense was committed while petitioner was engaged in the commission of rape, or (3) for murder if that offense was committed while petitioner was engaged in the commission of "kidnaping with bodily harm, aggravated sodomy." The jury found that all three offenses were committed during the commission of the specified additional offenses, and it imposed three death sentences on petitioner.

On appeal, the Supreme Court of Georgia held that the first two death sentences imposed by the jury could not stand. 241 Ga. 49, 52, 64, 243 S.E.2d 496, 501, 508 (1978). Both sentences depended upon petitioner's having committed forcible rape, and the court determined that the jury had not properly convicted petitioner of that offense.

In addition, the Supreme Court of Georgia held that the State could not rely upon sodomy as constituting the bodily injury associated with the kidnaping. Nonetheless, despite the fact that the jury had been instructed that the death penalty for murder depended upon a finding that it was committed while petitioner was engaged in "kidnapping with bodily harm, *aggravated sodomy*" (emphasis added), the Georgia Supreme Court upheld the third death penalty imposed by the jury. It did so on the theory that, despite the lack of a jury finding of forcible rape, evidence in the record supported the conclusion that petitioner was guilty of that offense, which in turn established the element of bodily harm necessary to make the kidnaping a sufficiently aggravating circumstance to justify the death sentence.

In *Cole v. Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948), petitioners were convicted at trial of one offense but their convictions were affirmed by the Supreme Court of Arkansas on the basis of evidence in the record indicating that they had committed another offense on which the jury had not been instructed.

In reversing the convictions, Mr. Justice Black wrote for a unanimous Court:

"It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.... To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." *Id.*, at 201–202, 68 S.Ct. at 517.

**These fundamental principles of procedural fairness apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt-determining phase of any criminal trial. Cf. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In light of these principles, the death sentence for the crime of murder with malice aforethought cannot stand.**

Insofar as the petition for certiorari challenges the conviction of kidnaping with bodily injury and the imposition of the death sentence, it is granted along with petitioner's motion to proceed *in forma pauperis*. The judgment of the Supreme Court of Georgia affirming the conviction for kidnaping with bodily injury and the death sentence for murder is reversed, and the case is remanded for further proceedings not inconsistent with this opinion. Insofar as the petition challenges the convictions for murder, kidnaping, and statutory rape, it is denied.

It is so ordered. *Presnell, supra*, 439 U.S. at 14–17, 99 S.Ct. at 235–37 (footnotes omitted) (bold emphasis added).

The *Cabana* majority was well aware of what it had held in *Presnell*, but denigrated its own holding in two ways: one, by not accepting any responsibility, but instead casting it on to the *"Presnell* Court," as though such nomenclature established an identity separate from that of the Supreme Court of the United States, and two, by saying that the *"Presnell* Court appeared to *assume* that the jury's constitutional

role in determining sentence was equivalent to its role in determining sentence"— which *assumption* it declared no longer tenable.

*Caldwell v. Mississippi,* 472 U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (June, 1985), is even more recent than *Presnell* —in fact, has not attained its first anniversary. Justice Blackmun, writing in *Cabana* for himself and two other justices, immediately pointed out the majority's short memory of it, and lack of respect for case precedent:

> Last Term, in *Caldwell v. Mississippi,* 472 U.S. ——, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), (a case not even cited by the Court in its controlling opinion, *ante* ), we recognized institutional limits on an appellate court's ability to determine whether a defendant should be sentenced to death:

> "Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed '[those] compassionate or mitigating factors stemming from the diverse frailties of humankind.' When we *held that a defendant has a constitutional right to the consideration of such factors, we clearly envisioned that the consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses."* Id., at ——, 105 S.Ct. at 2640 (citations omitted; interpolation in original).

That statement in *Caldwell* is not an abstract disquisition on appellate courts generally. It concerns, in particular, the institutional limits of the Supreme Court of Mississippi in capital cases. Today, the Court ignores those recently stated limits and holds that the Mississippi Supreme Court may be competent to make, on a paper record, the findings required

by *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)— that Crawford Bullock, Jr., killed, attempted to kill, or intended to kill Mark Dickson, and thus deserves to die. The Court reaches that result by paying lip service to the constitutional significance of *Enmund* while relegating *Enmund* findings to a position of judicial afterthought. The nature of the *Enmund* findings, however, dictates who must make them and at what point in the sentencing process they must be made. The Eighth Amendment requires that *Enmund* findings be made at the trial court level before the sentence condemns a defendant to death. The Court's misreading of *Enmund* threatens a retreat from the constitutional safeguards on the capital sentencing process that the Court has acknowledged in the decade since *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *Cabana, supra* (Blackmun, J., dissenting) (emphasis added).

That Justice Blackmun was 100 percent correct in his assessment of the *Cabana* majority's incomprehensible and inexcusable failure to mention, let alone attempt a distinction of, Caldwell.

Justice Stevens was quick to point out that *Enmund* [1] culpability under Mississippi law has been wisely left to a jury as "the decisionmaker that is best able to 'express the conscience of the community on the ultimate question of life or death.' (Citation omitted.)." *Cabana, supra* (Stevens, J., dissenting). What madness is this, then,[2] that the Supreme Court of the United States, while ignoring *Caldwell,* and misapplying *Presnell,* not to forget *Enmund,* has gratuitously taken upon itself to preach to the Mississippi Supreme Court that it may ignore Mississippi statutory law if it wishes, and make the necessary findings from a paper record which are required in balancing the life-or-death equation. What Justice Shepard wrote in

---

1. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

2. The author concedes a plagiaristic use of Justice Shepard's *Creech* language, *supra.*

*Creech,* as quoted *supra,* is absolutely applicable. How long *Cabana* will hold sway on the High Court is anyone's guess. *Caldwell* lasted less then one year.