**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 29631**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **2007 Opinion No. 9** |
| Plaintiff-Respondent, | ) |
| | ) **Filed: March 7, 2007** |
| v. | ) |
| | ) **Stephen W. Kenyon, Clerk** |
| CHRISTOPHER DAVID GRIFFITH, | ) |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bonneville County. Hon. Richard T. St. Clair, District Judge.

Judgment of conviction for first degree murder, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant. Justin M. Curtis argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

_____

LANSING, Judge

Christopher David Griffith appeals from his conviction of first degree murder, asserting numerous trial errors, error in the denial of his motion for a new trial, and an abuse of discretion in the sentence imposed. We affirm.

**I.**

**FACTUAL & PROCEDURAL BACKGROUND**

On November 6, 2001, two-year-old Tegan Rees sustained a blow to his body. The child's pancreas was compressed against the spine, cutting the pancreas nearly in half, and he bled to death. Tegan's body exhibited multiple fresh bruises on the ears, forehead, trunk and buttocks and numerous hematomas (swelling caused by blood) attendant to the facial bruises. The only persons in the apartment at the time of injury were Griffith and Tegan's four-year-old sister, B.M.

1

Griffith was charged with first degree felony murder by aggravated battery of a child under twelve years of age, Idaho Code §§ 18-4001, 18-4003(d). The State alleged that Griffith beat Tegan to death. Griffith pleaded not guilty. At trial, his defense was that the fatal injury could have been caused by B.M. jumping or falling upon Tegan from a height. The jury returned a verdict of guilty.

Following his conviction, Griffith filed a motion for a new trial on two grounds. First, he asserted that the district court erred by entering a felony conviction against Griffith in a separate grand theft case after those charges had previously been dismissed and then ruling that the new conviction would be admissible in the murder trial to impeach Griffith if he were to testify at trial. Second, Griffith asserted that a new trial was warranted because of newly discovered evidence that an expert witness for the prosecution had lied concerning his qualifications. The district court denied a new trial and imposed on Griffith a unified life sentence with twenty-two years determinate.

In this appeal Griffith asserts various errors in the trial and post-trial proceedings, and he challenges his sentence as excessive.

## II.

## DISCUSSION

### A. District Court's Alteration of Judgment in Prior Case and Ruling that the New Conviction Would be Admissible for Impeachment if Griffith Testified

More than four years before Tegan's death, Griffith had been charged with grand theft, and the district judge who presided in the grand theft case was the same judge who later presided in the instant murder case. After pleading guilty, Griffith was granted a withheld judgment and placed on probation in August 1997. In February 2000, the district court entered an order of satisfactory discharge from probation, which provided that the matter be entered as a felony conviction. That same month, however, Griffith filed an application asking the district court to set aside his guilty plea and dismiss the action pursuant to I.C. § 19-2604(1) on the ground that he had at all times complied with the terms of his probation. In April 2000, the district court granted Griffith's application, entering an order that dismissed the grand theft case and restored Griffith's civil rights. In October 2002, about two and one-half weeks before Griffith's murder trial began, the prosecutor filed a motion in limine seeking authorization, pursuant to I.R.E. 609, to introduce evidence of Griffith's prior "conviction" for grand theft for impeachment purposes if Griffith were to testify in the murder trial. After the State filed this motion, the district court

2

apparently scheduled a hearing in the grand theft case.[1]  The district court then vacated its April 2000, order that had dismissed the grand theft case, concluding that Griffith had not qualified for a dismissal of the grand theft charge because he had not fully complied with probation in that case.  Later, after Griffith's murder trial had begun, the district court granted the State's motion in limine, allowing the prosecution to use Griffith's grand theft conviction for impeachment purposes in the murder trial if he chose to testify in his defense.

Griffith then moved for a continuance of the murder trial.  The defense asserted that throughout its preparation for the murder trial, it intended that Griffith would testify, that the district court's ruling had forced Griffith to not testify, and that the defense needed time to reorganize its case.  The district court denied the motion, and the murder trial proceeded as scheduled.  In his motion for a new trial in the present case, Griffith asserted, as one ground, error in the district court's actions concerning the grand theft case.  The district court denied the motion.

Griffith immediately appealed from the new judgment in the grand theft case.  In 2004, well after the trial in the instant murder case, this Court rejected the district court's various justifications for vacating the April 2000, dismissal order and held the district court had no jurisdiction to set aside the dismissal order two and one-half years after it was entered.  *See State v. Griffith*, 140 Idaho 616, 617-19, 97 P.3d 483, 484-86 (Ct. App. 2004).

In the present appeal, Griffith challenges both the denial of his motion for a continuance to redesign his defense strategy and the denial of his motion for a new trial.  We conclude that, regrettably, we cannot reach the merits of the new trial motion that was based upon the court's I.R.E. 609 ruling because Griffith did not adequately preserve the issue by either testifying at trial or making an adequate offer of proof of the testimony that he wished to give.  It has long been the rule in this state that in order to raise on appeal a claim of error in an I.R.E. 609 ruling that would permit impeachment of a defendant with a prior conviction, the defendant must present his testimony or, at the least, make an offer of proof describing the testimony that the Rule 609 ruling dissuades him from presenting.  In *State v. Garza*, 109 Idaho 40, 704 P.2d 944 (Ct. App. 1985), this Court stated:

---

[1]      The record is less than clear because proceedings evidently took place in the grand theft case of which we have no transcripts.

3

The United States Supreme Court recently held, in *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), that in order to "raise and preserve for review a claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. at ___, 105 S.Ct. at 464. In a concurring opinion, Justice Brennan identified two rationales for the Court's decision. First, the weighing process required under Rule 609(a), Federal Rules of Evidence, by which the probative value of sensitive evidence is balanced against its unfair prejudicial impact, can be evaluated adequately on appeal only when the specific factual context of a trial has unfolded. Second, if the defendant declines to testify, the appellate court is handicapped in making the required harmless error determination should the district court's ruling prove to be incorrect.

*Garza*, 109 Idaho at 45, 704 P.2d at 949. This Court adopted the *Luce* reasoning and held "that a criminal defendant must take the stand if he wishes to preserve on appeal the question of impeachment by a prior felony conviction." *Id.*

Subsequently, we held that an adverse ruling on the admissibility of impeachment evidence can also be preserved for appellate review through an adequate offer of proof. In *State v. Cherry*, 139 Idaho 579, 581-83, 83 P.3d 123, 125-27 (Ct. App. 2003), the district court ruled that three statements made by the defendant to the police were voluntary and, therefore, admissible for impeachment purposes should the defendant testify. The defendant did not testify but made an offer of proof of the testimony he would have given had he not been subject to impeachment with the prior statements. Relying on *Garza*, the State asserted that Cherry could not appeal the district court's ruling because he chose not to testify. *Id.* at 582, 83 P.3d at 126. This Court rejected the State's argument and held that the *Luce* rule should not be strictly applied where a defendant sought suppression of evidence allegedly obtained in violation of constitutional rights. *Id.* We said, "[W]here a defendant elects not to testify due to the trial court's decision allowing impeachment with evidence allegedly obtained in violation of constitutional rights, and where the defendant has made an adequate offer of proof as to the testimony that otherwise would have been introduced, he should not be precluded from raising the constitutional question on appeal." *Id.*

Even if this Court were to extend our holding in *Cherry* to allow a party to preserve an I.R.E. 609 issue for appellate review by an adequate offer of proof, rather than by actually testifying at trial, Griffith's claim of error would not be preserved, for his "offer of proof" here was wholly inadequate. In support of his motion for a new trial, Griffith submitted his affidavit averring that he would have taken the stand in his own defense if the district court had not ruled that the prior conviction was admissible for impeachment purposes. He gave no details of his

4

intended testimony but said only that it was his desire at trial to "explain the facts and circumstances surrounding the events leading up to Tegan Rees's death." This Court cannot conduct a harmful/harmless error analysis based upon this thin representation of the proposed content of Griffith's trial testimony. Therefore, Griffith's claim of error in denial of his new trial motion is not reviewable and we do not address it on the merits.

We next turn to Griffith's argument that the district court should have allowed a continuance of the trial to enable Griffith to redesign his defense in light of the court's "surprise" ruling allowing the State to impeach with the grand theft conviction. The denial of a motion for a continuance is reviewed under an abuse of discretion standard. *State v. Nunez*, 133 Idaho 13, 21, 981 P.2d 738, 746 (1999); *State v. Ransom*, 124 Idaho 703, 706, 864 P.2d 149, 152 (1993); *State v. Harshbarger*, 139 Idaho 287, 291, 77 P.3d 976, 980 (Ct. App. 2003). To warrant reversal, a defendant must show prejudice from the denial of the request for a continuance. *Nunez*, 133 Idaho at 21, 981 P.2d at 746.

Griffith's claim of error in the denial of a continuance suffers from much the same deficiency as his claim of error in the I.R.E. 609 ruling as justification for a new trial; on neither his motion for continuance nor his motion for a new trial did he describe any way in which his defense evidence could have been changed, nor any other effect on the defense presentation. Bare allegations that a defendant will be prejudiced absent a continuance are insufficient. *State v. Siegel*, 137 Idaho 538, 541-42, 50 P.3d 1033, 1036-37 (Ct. App. 2002).

Moreover, to the extent that his motion for a continuance was premised on an allegation of unfair surprise, it is unsupported by the record. The prosecutor had given notice months earlier that it intended to use the grand theft "conviction" for impeachment purposes. As noted by the district court, if Griffith had wished a pretrial ruling on the admissibility of the prior grand theft charge to better plan his defense, he could have filed a motion in limine to exclude reference to that case. Instead, Griffith waited for the issue to develop mere days before trial and then sought a continuance, primarily based on an unsubstantiated assertion of unfair surprise. On this record, we cannot say that the district court abused its discretion in denying the defense motion for a continuance.

5

**B.      Motion to Disqualify the Presiding Judge**

With his motion for a continuance, Griffith also filed a motion to disqualify the presiding district judge on the grounds of bias and prejudice.  The district court denied the motion, and Griffith assigns error to the ruling.

Pursuant to Idaho Criminal Rule 25(b)(4), a motion to disqualify a judge in a criminal case may be made on the ground that the judge "is biased or prejudiced for or against any party or that party's case in the action."  The disposition of such a motion is within the discretion of the trial court.  *Sivak v. State*, 112 Idaho 197, 206, 731 P.2d 192, 201 (1986); *State v. Saunders*, 124 Idaho 334, 336, 859 P.2d 370, 372 (Ct. App. 1993).  A motion for disqualification should be granted "only where there is actual prejudice against the litigant of such a nature as to render it improbable that the presiding judge could or would give the litigant a fair and impartial trial." *State v. Elliott*, 126 Idaho 323, 329, 882 P.3d 978, 984 (Ct. App. 1994).  *See also State v. Pizzuto*, 119 Idaho 742, 776, 810 P.2d 680, 714 (1991), *overruled on other grounds by State v. Card*, 121 Idaho 425, 432, 825 P.2d 1081, 1088 (1991); *State v. Waterman*, 36 Idaho 259, 210 P. 208 (1922).

On appeal, Griffith contends that the presiding judge's prejudice was demonstrated by rulings adverse to Griffith, including issuance of a bench warrant (later quashed), denial of a motion for a continuance in July 2002 (that trial date was later continued), denial of a motion for a change of venue based on pretrial publicity, and the district court's improper *sua sponte* reentry of the grand theft conviction.  Griffith further contends, based on counsel's affidavit, that the district court said at a pretrial conference that "based on what he had read in the newspapers, Mr. Griffith was guilty and should plead guilty."

The fact that a trial court makes rulings that a party does not like is not, in and of itself, evidence of impermissible bias.  As stated by this Court, "[a] disqualifying prejudice cannot be deduced from adverse rulings by a judge, whether they are right or wrong."  *Desfosses v. Desfosses*, 120 Idaho 27, 30, 813 P.2d 366, 369 (Ct. App. 1991).  Whether or not the district court made comments at a pretrial conference concerning his belief in the defendant's guilt, we are not prepared to hold that a trial court must refrain from all such comments or face disqualification for cause.  Here, as in most criminal cases, the district court was not the trier of fact on the issue of the defendant's guilt. A belief of the defendant's guilt on the part of a trial court becomes problematical only if it unfairly infects the district court's rulings during the

6

pendency of the proceedings, and Griffith has not shown that to be true here. Griffith's main complaint concerns the district court's actions with regard to the grand theft case. While this Court has held that the district court erred, the error was not so egregious or obviously prompted by bias as to disqualify the judge. We find no abuse of discretion in the denial of the disqualification motion.

## C.      B.M.'s Competence to Testify

Tegan's sister, B.M., was four years and nine months old at the time of Tegan's death and was five years and nine months old at the time of trial. The district court conducted a pretrial examination to determine whether she was competent to testify, found her competent, and allowed her to testify for the State. Griffith contends the district court's determination of competence was erroneous.

Griffith argues that I.C. § 9-202(2) creates a presumption that child witnesses under the age of ten are not competent, because the statute requires the trial court to conduct a pretrial hearing to determine the competence of such a child. Griffith is incorrect for two reasons. First, the statute does not speak in terms of a presumption nor does its language fairly imply such a legislative intent. Second, our Supreme Court has held that section 9-202(2) is invalid to the extent that it is inconsistent with I.R.E. 601, which governs witness competency determinations. *State v. Poole*, 124 Idaho 346, 349, 859 P.2d 944, 947 (1993). Rule 601 provides in part:

> Every person is competent to be a witness except:
>     (a) Incompetency Determined by the Court. Persons whom the court finds
> to be incapable of receiving just impressions of the facts respecting which they
> are examined, or of relating them truly.

This rule gives the trial court the discretion to determine witness competency. *Ransom*, 124 Idaho at 710, 864 P.2d at 156; *State v. Mader*, 113 Idaho 409, 410, 744 P.2d 137, 138 (Ct. App. 1987). In *State v. Vondenkamp*, 141 Idaho 878, 882, 119 P.3d 653, 657 (Ct. App. 2005), we held that I.R.E. 601 creates a presumption of competency, and noted that the value to be given the witness's testimony is "particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." *Id. See also State v. Iwakiri*, 106 Idaho 618, 622, 682 P.2d 571, 575 (1984).

Griffith contends that some of B.M.'s responses to the district court's questions during the competency hearing establish that she was not competent to testify. Whether some of her responses were inappropriate, however, is not the ultimate issue. The district court found that the

7

child could distinguish between telling the truth and telling a lie and had the ability to perceive events and relate them to a jury. This finding is supported by the overall record of B.M.'s responses during the competency evaluation, and as the district court noted, her testimony was "subject to the weight that the jury might attach to it." Griffith has not shown that the district court abused its discretion in finding B.M. to be a competent witness.

## D. Hearsay Presentation of B.M.'s Out-of-Court Statements

Before trial, the State moved in limine for a ruling that Lee Ann Shaw, a social worker, would be allowed to testify to a statement made to Shaw by B.M. on the day of Tegan's death. The State urged that although B.M.'s statement was hearsay, it was admissible under the excited utterance exception of I.R.E. 803(2). The district court held that the statement would be admissible as an excited utterance if the necessary foundation were laid by the State at trial. Shaw later testified to the statement at trial. Griffith contends that the district court erred in its ruling on his motion in limine.[2]

Out-of-court statements offered for the truth of the matter asserted are generally inadmissible as hearsay, I.R.E. 802, but the excited utterance exception allows hearsay that is a "statement relating to a startling event or condition while the declarant was under the stress of excitement caused by the event or condition." I.R.E. 803(2). To fall within this exception, there must be a startling event that renders inoperative the normal reflective thought process of the observer, and the declarant's statement must be a spontaneous reaction to that event rather than the result of reflective thought. *State v. Parker*, 112 Idaho 1, 4, 730 P.2d 921, 924 (1986); *State v. Doe*, 140 Idaho 873, 876, 103 P.3d 967, 970 (Ct. App. 2004); *State v. Hansen*, 133 Idaho 323, 325, 986 P.2d 346, 348 (Ct. App. 1999). In considering whether a statement constitutes an excited utterance, the totality of the circumstances must be considered, including the nature of the startling condition or event, the amount of time that elapsed between the event and the statement, the age and condition of the declarant, the presence or absence of self-interest, and

---

[2]    The statement of issue in Griffith's appellate brief asserts that the district court also erred by granting the State's motion in limine regarding B.M's out-of-court statements to two other people, Janet S. Liester and Dannielle Hawkins. However, neither Liester nor Hawkins testified at trial, and a videotaped interview conducted by Hawkins was neither played for the jury nor admitted as an exhibit. Because there cannot be any prejudice to Griffith attendant to the district court's ruling as to statements made to these two individuals, those portions of the district court's order will not be addressed.

whether the statement was volunteered or made in response to a question. *Doe*, 140 Idaho at 877, 103 P.3d at 971. Whether to admit a statement as an excited utterance is committed to the trial court's discretion, *State v. Bingham*, 116 Idaho 415, 421, 776 P.2d 424, 430 (1989); *Doe*, 140 Idaho at 876, 103 P.3d at 970, and that decision will not be disturbed on appeal absent an abuse of that discretion. *Id.* at 877, 103 P.3d at 971.

At about 4:30 p.m. on the day in question, Griffith called 911 to report that Tegan was not breathing. An ambulance responded, followed by law enforcement officials and, at some point, members of the family. Shaw arrived at the scene between 7:30 and 8 p.m. to take custody of B.M. Shaw testified that as she was driving B.M. to a foster home, B.M. was upset and on the verge of crying, and that she volunteered statements about what happened to her brother. Shaw testified:

> [B.M.] said, . . . "My brother is at the hospital. My brother got dead. He closed his eyes and got dead. Chris spanked him hard. My brother messed his pants. Chris is mean and has big muscles. Chris spanked him hard." And she clapped her hands, said "It sounded like this." And then she said, let's see, she said, "I could hear things fall in the bathroom."

This Court has recognized that where a challenged hearsay statement was a victim's disclosure of a sexual assault, and particularly where the victim was a child, the Idaho appellate courts have given the excited utterance exception a more liberal application than is given in other circumstances. *Hansen*, 133 Idaho at 326-27, 986 P.2d at 349-50. This line of authority began with *Parker*, where the Idaho Supreme Court affirmed the admission of a fourteen-year-old girl's statement that she had been raped, made to a family member about three hours after the crime. The *Parker* Court explained:

> The tendency to admit such statements, even when made hours after the event, probably lies in their high probative value. Given that sexual assault crimes violate one's most intimate physical and mental feelings, the victim can reasonably be expected not to discuss the crime until meeting with a family member, close friend, law enforcement agent, or other trusted individual. . . .
>     . . . .
>     A sexual assault is one of the most distressing experiences a person could have. The distress is likely to remain bottled up in the victim until she or he can talk about what happened.

*Parker*, 112 Idaho at 4, 730 P.2d at 924.

Griffith first argues that because this case did not involve sexual abuse, the reasoning of *Parker* does not apply. We disagree, for it is hard to imagine a more startling or distressing

9

event for a four-year-old child than being present during the violent death of a sibling. Griffith also maintains that a three-hour lapse between the event and the statement is too long, as a matter of law, for B.M.'s statements to be considered an excited utterance because she could not have remained under the stress caused by being in the home and hearing events leading to the death of her younger brother. Again, we are unpersuaded. There is no bright line rule as to the allowable time span between the event and the statement, and one likely should not be drawn. When a significantly distressing event is involved, Idaho's appellate courts have upheld the admission of statements as excited utterances, especially when made by young children, even when several hours have passed since the event. *See Bingham*, 116 Idaho at 421, 776 P.2d at 430 (statement made by twelve-year-old child within two hours of molestation); *Parker*, 112 Idaho at 3-4, 730 P.2d at 923-24 (statement made by fourteen-year-old child within two or three hours of molestation); *State v. Kay*, 129 Idaho 507, 517, 927 P.2d 897, 907 (Ct. App. 1996) (statement made same night as abduction and molestation); *State v. Stover*, 126 Idaho 258, 263, 881 P.2d 553, 558 (Ct. App. 1994) (statement made within a "few hours" of incident). *Compare State v. Zimmerman*, 121 Idaho 971, 975-76, 829 P.2d 861, 865-66 (1992) (holding that five-year-old's statement made at least five days after incident was not excited utterance). Here, although B.M.'s grandparents, neighbors and police were at the scene before Shaw arrived, Shaw testified that the child appeared distracted and overwhelmed at that point. The trial court could properly infer that B.M.'s seclusion with Shaw in Shaw's car was the first quiet time in which B.M. would have felt an opportunity to give expression to what she had seen and heard. B.M.'s age is of great significance, for a four-year-old child is not, generally speaking, prone to reflective thought of such sophistication as to fabricate her detailed statement to Shaw. B.M. was emotionally upset at the time, there is no evidence that she made the statement to serve her self-interest, and the statement was not made in response to questioning but was volunteered. The district court found that B.M. was still under the stress of witnessing Tegan's death when she made the statement three hours later, and we decline to hold that three hours is disqualifying as a matter of law. We find no abuse of discretion in the admission of the statement as an excited utterance.

E.    **Autopsy Report**

The State presented the testimony of Dr. Steve Skoumal, who conducted a forensic autopsy to determine the cause of Tegan's death. Dr. Skoumal prepared an autopsy report that

10

was also admitted into evidence over Griffith's hearsay objection. The district court held that the report was admissible under the business records exception, I.R.E. 803(8)(B). Griffith asserts that this ruling was erroneous because the report should have been considered an investigative report prepared for the government, made inadmissible by I.R.E. 803(8)(B). *See generally State v. Sandoval-Tena*, 138 Idaho 908, 912, 71 P.3d 1055, 1059 (2003).

We hold that, assuming error, there was no prejudice attendant to the admission of the autopsy report because information in the report was merely cumulative of other evidence presented at trial. Dr. Skoumal testified, without objection, to all of the information contained in the report that was of import to the trial. Therefore, the admission of the autopsy report into evidence, even if error, was harmless. *Id.*

**F.      Motion for New Trial Based on Evidence of Perjury by State's Expert**

Dr. Saami Shaibani was an expert witness for the State at Griffith's trial in November 2002. He was presented as an expert in physics and injury mechanism analysis. In March 2003, Griffith filed his motion for a new trial, asserting that he had obtained newly discovered evidence that Shaibani had lied when he testified at trial that "I am a clinical professor at Temple University" and that "[d]epending on the job title, I've been with Temple University ten years now."

In support of his motion, Griffith submitted a transcript and exhibits from a North Carolina murder case, *State v. Peterson*, which went to trial after Griffith's trial and in which Dr. Shaibani was a witness for the prosecution. In *Peterson*, Shaibani testified that he was a "clinical professor" having "a research affiliation with Temple University." After Shaibani testified to the rest of his credentials and the prosecution proffered him as an expert, defense counsel informed the trial court that he had information that Shaibani was lying about his academic appointments. Defense counsel produced a September 27, 2001 letter from Edward Gawlinski, chair of the Department of Physics at Temple University. The letter stated that to the best of Gawlinski's recollection, Shaibani was an "Adjunct Professor of Physics" for only a short period in the early 1990s, that Temple University had no record confirming this appointment, that there is no position entitled "clinical associate professor of physics," that any claim by Shaibani that he was currently a member of or even affiliated with Temple University was fraudulent, and that at least once a year Gawlinski had to write this sort of letter because Shaibani continued to try to establish his bona fides as an expert witness by claiming

11

membership in the Physics Department at Temple.  Through questioning of Shaibani, it was revealed that he had previously been cross-examined with the Gawlinski letter in another criminal trial.  Defense counsel also submitted a letter from an attorney for Temple University clarifying that the Gawlinski letter was inaccurate in that counsel had located a document showing that Shaibani "was awarded a courtesy appointment as a Clinical Associate Professor . . . for the period September 1, 1995 through August 31, 1998," but that "[a]ny current representation that Mr. Shaibani is employed by or affiliated with Temple University is simply untrue."  Shaibani then admitted that Temple had not funded any of his research for "a good number of years," that it did not provide him with any labs or resources, and that it did not ask him to do any research.  The North Carolina trial court struck Shaibani's testimony from the record in the *Peterson* trial, finding that he had committed perjury concerning his credentials.

In opposition to Griffith's motion for a new trial, the State submitted a September 10, 2004, transcript of Shaibani's testimony and selected exhibits from a South Dakota habeas corpus case, *Aesoph v. Weber*.  Shaibani had testified for the prosecution in Aesoph's criminal trial, and Aesoph sought relief from his conviction based upon Shaibani's alleged perjury concerning his credentials.  In this habeas corpus hearing, Shaibani testified that before his temporary clinical associate professor appointment was scheduled to expire in August 1998, he began to make a series of short telephone calls to the Temple University Physics Department seeking to have his appointment extended.  He was initially unsuccessful.  Then, in a two-minute telephone conversation in August 1998, someone (he thinks her name might have been Mary) in the Physics Department verbally authorized him to continue to use the title, so he did so.  Thereafter, Shaibani apparently sent letters once a year to Gawlinski reporting his accomplishments with a reminder that he was a "clinical associate professor."  Shaibani further testified that following the *Peterson* case, he no longer uses this title because it is apparent that the Physics Department chair does not want him to.  The record before us does not disclose the disposition of the *Aesoph* habeas corpus action.

In the case before us, the district court accepted Griffith's assertion that Shaibani had lied concerning his qualifications, but nevertheless denied a new trial.  In responding to Griffith's appeal from that order, the State "does not dispute, that [the] portion of Dr. Shaibani's testimony [concerning his affiliation with Temple University] was false because he has never had more than a temporary adjunct professorship at Temple University."

12

A new trial may be ordered in a criminal case when "new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial." I.C. § 19-2406(7). There is no dispute that Griffith presented newly discovered evidence, but the parties differ with respect to the test that should be applied to determine whether this new evidence warrants a new trial for Griffith. The State advocates for the test articulated in *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976):

> A motion based on newly discovered evidence must disclose (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

Griffith, on the other hand, urges application of the test adopted by our Supreme Court in *State v. Scroggins*, 110 Idaho 380, 384-85, 716 P.2d 1152, 1156-57 (1985), for new trial motions that are based on a recantation of testimony given by a witness at the defendant's trial. The test was adopted from *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928), *overruled by United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004). Although the precise content of the *Scroggins* test is not entirely clear, as will be discussed below, it was initially outlined as follows:

> In *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928), the court held that where a party contends that a government witness falsely testified at trial, the following elements must be met: (1) that "[t]he court is reasonably well satisfied that the testimony given by the material witness is false;" (2) "[t]hat without it the jury might have reached a different conclusion;" (3) "[t]hat the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial." *Larrison*, 24 F.2d at 87-88 (emphasis omitted).

*Scroggins*, 110 Idaho at 384-85, 716 P.2d at 1156-57. Subsequently, in a footnote, this Court indicated that the third element of the test, "[t]hat the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial," requires "that a defendant be diligent in determining whether false testimony will be presented and in offering any available evidence to rebut it." *State v. Lawrence*, 112 Idaho 149, 152 n.2, 730 P.2d 1069, 1072 n.2 (Ct. App. 1986) (citing *Larrison*, 24 F.2d at 88).

The two tests differ in several ways, most significantly with regard to the likelihood that the new evidence would produce a different result at trial. Whereas the *Drapeau* test requires that the defendant demonstrate that the new evidence "will *probably* produce an acquittal,"

13

*Scroggins* requires only a showing that without the perjured testimony, the jury "*might* have reached a different conclusion." Thus, *Scroggins* sets a less exacting standard when the new trial motion is based on a recantation because "[p]erjured testimony affects the integrity of the judicial process in a way that overlooked testimony does not." *Lawrence*, 112 Idaho at 151, 730 P.2d at 1071.

Idaho case law subsequent to *Scroggins* lacks clarity as to the precise elements of the test where a new trial motion is based on a witness's recantation. *See*, *e.g.*, *State v. Fields*, 127 Idaho 904, 914, 908 P.2d 1211, 1221 (1995) (where our Supreme Court set forth the original *Larrison* test with slight, inconsequential, rewording); *Ransom*, 124 Idaho at 712, 864 P.2d at 158 (where the Supreme Court stated a new trial based on recanted testimony was allowed "if the defendant (1) submits an affidavit by a government witness in which the witness recants his or her testimony, specifies in what ways he or she dishonestly testified, and in what ways, if given the opportunity, he or she would testify differently, and (2) makes a showing that such changed testimony may be material to a finding of the defendant's guilt or innocence"); *Cootz v. State*, 129 Idaho 360, 365-67, 924 P.2d 622, 627-29 (Ct. App. 1996) (where this Court applied the original *Larrison* test from *Scroggins* to a witness's recantation); *Bean v. State*, 119 Idaho 645, 646-47, 809 P.2d 506, 507-08 (Ct. App. 1990) (where this Court restated the test as requiring a showing "(a) that the testimony given at trial was false; (b) that the testimony was material to the outcome; and (c) that he was diligent in challenging the testimony, or did not know of its falsity until after the trial"); *Lawrence*, 112 Idaho at 152, 730 P.2d at 1072 (stating that by certain language in *Scroggins*, the Idaho Supreme Court had "reformulated" the *Larrison* test). Because whatever inconsistencies exist in these formulations arise partly from Idaho Supreme Court decisions, it is not within this Court's authority to provide a definitive clarification. For present purposes, we will rely upon the original *Larrison* test adopted in *Scroggins*, as did the Idaho Supreme Court in its most recent decision addressing the subject, *Fields*.

Idaho case law calls for application of the *Scroggins/Larrison* test when a trial witness has recanted his or her trial testimony and evidence of that recantation has been presented to the trial court. *See State v. Lankford*, 116 Idaho 860, 873-74, 781 P.2d 197, 210-11 (1989); *Scroggins*, 110 Idaho at 385, 716 P.2d at 1157; *Cootz*, 129 Idaho at 365-67, 924 P.2d at 627-29; *Bean*, 119 Idaho 645, 809 P.2d 506, *aff'd Bean v. State*, 119 Idaho 632, 809 P.2d 493 (1991); *Lawrence*, 112 Idaho at 151-52, 730 P.2d at 1071-72. Any other type of new evidence presented

14

by a defendant as an alleged basis for a new trial, including other types of proof of perjury and evidence of a recantation that has itself been subsequently disavowed by the trial witness, are subject to the *Drapeau* test. *See Fields*, 127 Idaho at 914-15, 908 P.2d at 1221-22; *Ransom*, 124 Idaho at 711-12, 864 P.2d at 157-58; *State v. Welker*, 129 Idaho 805, 812, 932 P.2d 928, 935 (Ct. App. 1997); *Cootz*, 129 Idaho at 366, 924 P.2d at 628; *State v. Priest*, 128 Idaho 6, 15-17, 909 P.2d 624, 633-35 (Ct. App. 1995); *State v. Barlow*, 113 Idaho 573, 577-79, 746 P.2d 1032, 1036-38 (Ct. App. 1987).[3]

In the case before us, it is questionable whether the evidence of Shaibani's untruthfulness--presented through transcripts of his cross-examination in cases from other states--should be characterized as a "recantation." Shaibani never directly admitted that he had intentionally lied about his credentials, although his admissions during cross-examination showed that his earlier testimony concerning his affiliation with Temple University was highly misleading and a distortion of reality. It makes no difference to the outcome of this appeal, however, whether we apply the standards of *Scroggins/Larrison* or of *Drapeau*, because even utilizing the *Scroggins* test, which is the more advantageous to Griffith, we conclude that the trial court did not err in denying Griffith's motion for a new trial. To obtain a new trial under the *Scroggins* test, Griffith must show, among other things, that "without [the false testimony] the jury might have reached a different conclusion." The evidence of Shaibani's misrepresentation concerning his affiliation with Temple University does not satisfy that prong of the *Scroggins* test.

Application of this element is somewhat problematical where the fact about which an expert witness is found to have testified falsely is his credentials. It is not contended that Shaibani testified falsely about any other fact or opinion. It might legitimately be argued that if Shaibani had never testified about his alleged affiliation with Temple University, it would have had no effect on the verdict because Shaibani likely still would have been deemed qualified as an expert and permitted to present his opinion testimony. Nevertheless, we believe that is too "pat" an answer when an expert witness has been found to have presented perjured or grossly misleading claims of credentials. A proffered expert's persuasiveness as a witness may be

---

[3]     The only case we have found where the *Scroggins* test was applied to evidence of perjury that was *not* a witness recantation is *State v. Dunn*, 134 Idaho 165, 170, 997 P.2d 626, 631 (Ct.

largely dependent upon the jury's determination of the weight to be given the testimony based upon the jury's assessment of that witness's claimed qualifications and expertise. Further, if the newly discovered evidence of Shaibani's true relationship with Temple University had been known to defense counsel before Griffith's trial and could have been used in Shaibani's cross-examination, as occurred in the North Carolina case, the trial court might have found Shaibani so discredited that he would not have been allowed to testify as an expert. Therefore, for the purpose of this inquiry into the prejudicial effect of Shaibani's misrepresentation of his association with Temple University, we will consider whether the jury might have reached a different conclusion at Griffith's trial if Shaibani had not testified at all.

Shaibani was called as the last of several expert witnesses who testified for the prosecution. Most of his testimony was dedicated to his claimed training and experience and a detailed explanation of injury mechanism analysis. Ultimately, Shaibani opined that the force that caused Tegan's injury was "highly concentrated" in that the "force was applied in a small area in a concentrated manner." He also said that the injury occurred "faster than you could blink, almost, the blow, the insult, the impact that caused this injury was so rapid, so strong, so powerful, so violent that [the] outer part of the body didn't know what was going on." The State sought to elicit further opinion testimony from Shaibani, but the district court disallowed it, sustaining a number of defense objections.

On appeal, Griffith argues that Shaibani's testimony was critical to the jury's verdict because Shaibani was the only witness who testified as to the force required to produce the fatal injury. We disagree. The State's evidence established that the fatal injury was a transected pancreas caused by a blow to the child's body causing the pancreas to be pressed against the spine. The State's other evidence included Dr. Skoumal's testimony that the fatal injury was caused by blunt force trauma and that injuries to the pancreas are rare because the organ is well protected by its location in the human body. He further testified that he had previously seen this type of pancreatic injury in only two situations--in victims of motor vehicle accidents and in pedestrians struck by motor vehicles. It is apparent that, even without Shaibani's testimony, the

_____

App. 2000), an apparent inadvertent aberration.

16

jury would have recognized that a high level of force was required to cause the injuries that killed Tegan Rees.

The defense theory was that Tegan's fatal injury was caused by his four-year-old sister, B.M., falling or jumping on him, with her knees striking the area where the fatal blow occurred. To this end, the defense presented the testimony of Dr. Richard James Reimann, professor of physics at Boise State University. Dr. Reimann testified that, assuming that B.M.'s weight were directly behind her, a thirty-five pound child dropping knee first from a height would produce a significant amount of force. Griffith asserts that Shaibani's testimony was of great importance at his trial because the State used Shaibani in rebuttal to attack Dr. Reimann's testimony.

It is true that Shaibani criticized Dr. Reimann's opinions and his tests upon which they were based. However, considering other trial evidence which heavily countered Griffith's theory that Tegan's injuries could have been inflicted by his young sister, we are convinced the verdict would not have been different if Shaibani had not testified at all. As noted above, B.M. told a social worker that evening that Griffith had spanked Tegan for messing his pants, that she could hear a slapping sound and the sound of things falling in the bathroom, and that her brother "got dead." B.M. testified at trial that Griffith told her, "don't tell anyone." A daycare worker testified that she had seen Tegan naked the day before his death and that he then had no fresh bruises. Tegan's mother testified that when she bathed him on the day in question before leaving for work, he was fine with no fresh bruises anywhere. It was uncontested that the only persons in the apartment with Tegan at the time of the fatal injury were Griffith and B.M. Two videotaped police interviews of Griffith were admitted at trial. In both, Griffith stated that Tegan was fine and without bruises when Griffith changed his diaper. He said that after the diaper change, while Griffith washed his hands and began to change clothes, Tegan went into the next room where B.M. was present. Griffith repeatedly said that the children were happy and that he heard no commotion, crying or other disturbance between them before B.M. came and told him, minutes later, that Tegan was not breathing. Tegan's mother and grandmother testified that while at the hospital, Griffith, when asked several times, repeatedly stated that he had heard no commotion or other disturbance between the children. Both testified that Griffith, while rocking back and forth in distress, said that he was going to jail.

Many trial witnesses, including emergency responders and physicians, testified to other injuries on Tegan's body which evidenced that he had been beaten, and autopsy photographs

confirmed those injuries. These injuries included fresh bruises on the child's jaw, face, both ears, forehead, lower back, buttocks and chest, and swelling of his face. Dr. Jeffrey Stieglitz, an emergency room physician who attempted to revive Tegan, was of the opinion that the child had been beaten. Dr. Stieglitz testified that the bruises were getting worse during treatment, indicating that the injuries were recently sustained. Dr. Skoumal, who performed the autopsy, confirmed that the color of the bruises on Tegan's forehead and left ear indicated that they had been freshly inflicted. Dr. Skoumal opined that the cause of death was nonaccidental blunt force trauma.

Finally, Dr. Lori D. Frasier, a pediatric physician and associate professor of pediatrics who specializes in child abuse and neglect, testified that children at play typically acquire small contusions, not extensive contusions. She said that accidental contusions on children usually do not occur on the buttocks, abdomen, face neck and ears and that "the number and the multiplicity and location of contusions on Tegan's body were not consistent with any potential accidental mechanism" but "were all inflicted nonaccidental trauma abusive injuries." Dr. Frasier further testified that the injury to the pancreas would, in her opinion, have to come tangentially, from an undercut or from a blow from below.

Viewed collectively, the evidence was overwhelmingly inconsistent with Griffith's defense theory that Tegan's fatal injury was caused by B.M. jumping or falling onto him. The theory does not explain how the multitude of fresh bruises would have been inflicted all over the child's body in a span of a few minutes, all while Griffith was in the next room but heard no fight or other commotion between the children. The district court did not err in denying Griffith's motion for a new trial on the ground that perjured testimony had been presented by Dr. Shaibani.

### G.    Removal of Juror

After trial had begun, a juror gave a letter to the judge stating that her husband had a business relationship with a prosecution witness. The juror had disclosed this on her juror questionnaire, but during voir dire neither party inquired concerning the relationship. After the court informed counsel of the letter from the juror, Griffith moved for a mistrial. On inquiry by the court, the juror said that she had no discussions with any other jury member concerning these matters. The district court denied Griffith's motion for mistrial and, instead, removed the juror

from the panel, replacing her with a substitute juror.  Griffith now contends that the denial of his motion for a mistrial was error.

Idaho Criminal Rule 29.1 provides that a "mistrial may be declared upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial."  A trial court's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.  *Sandoval-Tena*, 138 Idaho at 912, 71 P.3d at 1059; *State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct. App. 1983).

We find Griffith's claim of error meritless because he has shown no possible prejudice where the juror was removed from the jury panel, did not participate in the verdict and, as found by the district court, had no discussions with any other jury member concerning her husband's relationship with a witness.  Griffith argues that prejudice exists because "the composition of the jury pool was still altered prior to trial" and that his challenges for cause and peremptory challenges were "affected."  While Griffith cites no case law in support of his claim of prejudice, we find guidance in *State v. Ramos*, 119 Idaho 568, 808 P.2d 1313 (1991), where the defendant argued that a trial court's failure to excuse a juror for cause forced him to use one of his peremptory challenges to exclude the juror.  Our Supreme Court held that to obtain relief in that circumstance, a defendant must show that one of the remaining jurors was biased against him.  *Id.* at 569-70, 808 P.2d at 1314-15.  The present circumstance is analogous.  Griffith has not demonstrated, or even suggested, that any of the other jurors on the final jury panel were biased against him.  Because Griffith was tried before an impartial jury, untainted by extraneous information, he has not shown that a mistrial was warranted.

## H.     Sentence

Finally, Griffith contends that his unified sentence of life, with twenty-two years determinate, for first degree murder is excessive.  The applicable standards are well settled.  The objectives of sentencing, against which the reasonableness of a sentence is to be measured, are the protection of society, the deterrence of crime, the rehabilitation of the offender and punishment or retribution.  *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982).  In examining the reasonableness of a sentence, we conduct an independent review of the record, focusing on the nature of the offense and the character of the offender.  *State v. Young*, 119 Idaho 510, 511, 808 P.2d 429, 430 (Ct. App. 1991).  We will find that the trial court abused

its discretion in sentencing only if the defendant, in light of the objectives of sentencing, shows that his sentence was excessive under any reasonable view of the facts. *State v. Charboneau*, 124 Idaho 497, 499, 861 P.2d 67, 69 (1993); *State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992).

Idaho Code § 18-4004 requires a life sentence with a minimum determinate term of ten years upon a conviction for first degree murder. Under the circumstances of this case, the beating death of a two-year-old child, the sentence is not excessive.

Chief Judge PERRY and Judge GUTIERREZ **CONCUR.**